Steven R. Weinmann (SBN 190956)
Steven.Weinmann@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:    (310) 943-0396
*Additional Counsel on Signature Page*
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BOULOM, KATHLEEN CHAMPIGNY, and ALANNA FARBER, individually, and on behalf of a class of similarly situated individuals,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, TOYOTA MOTOR NORTH AMERICA, INC., a California corporation, and TOYOTA MOTOR CORPORATION, a Japanese corporation,<br><br>　　　　Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violations of California's Consumers Legal Remedies Act<br>(2) Viol. of Unfair Competition Law<br>(3) Breach of Implied Warranty under the Song-Beverly Consumer Warranty Act<br>(4) Breach of Express Warranty under California Law<br>(5) Breach of Written Warranty under the Magnuson-Moss Warranty Act<br>(6) Breach of Implied Warranty under the Magnuson-Moss Warranty Act<br>(7) Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law<br>(8) Breach of Implied Warranty under Pennsylvania Law<br>(9) Breach of Express Warranty under Pennsylvania Law<br>(10) Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiffs Steven Boulom, Kathleen Champigny, and Alanna Farber ("Plaintiffs") bring this action for themselves and on behalf of all persons ("Class Members") in the United States, and in the alternative on behalf of all persons in the states of California and Pennsylvania, who purchased or leased 2019 and 2020 Toyota RAV4 Hybrids ("Class Vehicles").

2.      Defendants Toyota Motor Sales, U.S.A., Inc., ("TMS,") Toyota Motor North America, Inc. ("TMNA,") and Toyota Motor Corporation ("TMC") (collectively, "Toyota" or "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.     This is a consumer class action concerning the misrepresentation of material facts, the failure to disclose material facts, and safety concerns to consumers.

4.     Defendants manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' fuel systems are defective.

5.     Toyota advertised that Class Vehicles were equipped with 14.5 gallon fuel tanks and able to achieve 41 miles per gallon ("MPG") for city driving, 38 MPG for highway driving, and a combined 40 MPG.[1] This provides a range of 580 miles on a single tank of gas.[2]

| Weight/Capacity | | | |
|---|---|---|---|
| Curb weight (lb.) | 3755 | 3755 | 3800 |
| Fuel tank (gal.) | 14.5 | 14.5 | 14.5 |

---

[1] *See* https://www.toyota.com/rav4hybrid/ (last visited Jan. 30, 2020).
[2] *See* https://www.toyota.com/rav4/features/mpg/4444/4456/4454 (last visited Jan. 30, 2020).

6. Plaintiffs are informed and believe, and based thereon allege, that the fuel system in Class Vehicles is defective such that the fuel tank cannot be filled to its advertised capacity, compromising the promised range of the vehicles, increasing emissions, and increasing the risk of overflow during fueling (the "Fuel Tank Defect").

7. The Fuel Tank Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.

8. Toyota designed and manufactured the fuel systems in the Class Vehicles, which are part of a hybrid power design. The vehicle is powered by a 2.5-liter gasoline engine as well as electric motors. Starting in 2019, Toyota introduced the re-designed fifth generation RAV4, in order to "reinforce its hold and widen the lead as the number-one compact SUV" and to continue its reign as "Toyota's number-one model."[3]

9. In the fifth-generation hybrid versions of the RAV4, the front wheels are powered by both the gasoline engine and an electric motor, while the rear wheels draw power from a separate electric motor. This design changed the shape of the vehicles slightly, and Toyota re-designed a number of internal components in order to accommodate the new shape. One of the re-designed pieces was the fuel tank assembly ("fuel tank").

10. Since its introduction, this redesigned RAV4 Hybrid has been the subject of myriad complaints by consumers, who have been unable to fill up their vehicles to the advertised capacity of 14.5 gallons. When refueling, consumers report that the automatic shut-off activates well before the tank is full, usually after a mere 8 gallons have been added to the tank. Consumers can force

[3] Levin, Doron, "2019 Toyota RAV4 Takes Spotlight as Japanese Automaker's Top Seller and New Show Horse in U.S.," *Forbes*, https://www.forbes.com/sites/doronlevin/2018/11/19/2019-toyota-rav4-takes-spotlight-as-japanese-automakers-top-seller-and-new-show-horse-in-u-s/#4b37dfd516a8 (Nov. 19, 2018) (last visited Jan. 30, 2020).

the tank to accept up to two or three more gallons by slowly adding gas after the automatic shut-off has been triggered, but many have reported gas then spilling out of the vehicle well before the tank has actually been filled, which presents a clear-cut and unreasonable safety hazard. Even in those situations, the gas gauge in Class Vehicles rarely reads full and the computed Distance to Empty ("DTE") is usually in the 400-mile range, if not lower—well below the 580 range advertised by Defendants.

11.     The Fuel Tank Defect presents an unreasonable safety risk for Plaintiffs, members of the Class, and the general public, because, upon information and belief, the fuel systems in Class Vehicles are not properly vented, leading to increased emissions from the car, damaging the fuel system components due to higher internal pressure, and increasing the risk of fuel spilling out of the vehicle while being re-fueled.

12.     This hazardous defect has resulted in numerous complaints to authorized dealers throughout the country and over 100 complaints to the National Highway Traffic Safety Administration ("NHTSA") for vehicles that only began to be sold in Spring of 2019. As one frustrated 2019 RAV4 Hybrid owner from Sacramento, California (NHTSA ID Number: 11229116) reported to NHTSA on July 3, 2019:

> MY 14 GALLON CAPACITY FUEL TANK WILL NOT ACCEPT MORE THAN 9.9 GALLONS. EVEN WHEN I'VE RUN IT TO LOW FUEL WARNING LIGHTS, NEVER DOUBLE DIGIT FILLS. I'VE USED AT LEAST A DOZEN DIFFERENT GAS STATIONS AND SUPPLIERS INCLUDING ONE IN OREGON AND ALWAYS THE SAME LIMITATION. OWNERS MANUAL CAUTIONS AGAINST CONTINUING TO FILL AFTER AUTO SHUT OFF. WE HAVE TRIED FAST FILLS, SLOW FILLS, MANUALLY HOLDING THE NOZZLE AND HOLDINGS THE TRIGGER, MANY ANGLES ARE FAILING TO GET OVER 9.9! ROTTEN TO GET FAR LESS MILEAGE PER TANK THAN TOYOTA

1
2
3
4

COMMERCIALS SHOW. I AM TEMPTED TO TRY FILLING AFTER THE CLICK OFF. WHAT'S WRONG WITH MY VEHICLE? IS THIS DANGEROUS SYMPTOM OR MANUFACUTURING ERROR? CURRENT MILEAGE IS 2504 AND PROBLEM PERSISTS SINCE FORST BOUGHT NEW THROUGH THIS DATE. THANKS!

5
6
7
8
9
10

13.     Toyota acknowledged to Automotive News that it had opened an ongoing investigation into the Fuel Tank Defect December 22, 2019, but Toyota has refused to date to provide any notice to consumers, owners and lessees— including Class Members—about the defect or when they can expect a repair for the defect.[4]

11
12
13

14.     Despite acknowledging the defect internally and to authorized dealers, Toyota continues to market and sell the Class Vehicles, promising 41 miles per gallon ("MPG") for city driving, 38 MPG for highway driving, and a

14
15
16
17
18
19
20
21
22
23
24
25



26
27

---

[4] *See* Vellequette, Larry P., "Pain at the pump for some RAV4 hybrid owners," *Automotive News*, https://autonews.com/design/pain-pump-some-rav4-hybrid-owners (Dec. 22, 2019) (last visited Jan. 30, 2020).

28

combined 40 MPG.[5]  The combined mileage range is 580 miles, as noted by the U.S. Department of Energy.[6]

15.     The re-designed fifth generation RAV4 Hybrid was revealed in New York in March 2018 by William D. Fay, Senior Vice President of Automotive Operations at TMNA, as well as RAV4 Chief Engineer Yoshikazu Saeki.

16.     As described by Saeki, "The first reason for choosing this specific setup was to gain the longest driving distance.  In between, if you need to extend the range you can fill up with gasoline quite easily."[7]

17.     He further explained:

> RAV4 customers are normally quite busy in their everyday lives. So the main focus was how easily and quickly could they refill their cars. So if they could refill and run another 600 miles, that was a really important factor. Fueling up then doesn't become a burden…That's why we chose the hybrid system for the main powertrain. With one fill up, 600 miles. Gasoline and hybrid have same fuel tank capacity. The hybrid system is more about how efficient you can run your life around the car, not how efficient the system is in itself. It's not the pursuit of the fuel economy itself, it's how the hybrid system can enhance the efficiency of your life.

*Id.*

18.     Saeki confirmed these figures months later at the 2018 Paris Motor Show, where he claimed to have set the fuel efficiency and range goal of the Class Vehicles to be 600 miles or thereabouts before needing to refuel.  He explained the reasoning:

> I noticed in both Michigan and Los Angeles the frequency of trips to the gas station.  Every two weeks.  I imagined this as an inconvenience to owners.  And also, some customers like to do long drives, such as from Los Angeles to San Francisco.  It's just a waste of time to try and

---

[5] *See* https://www.toyota.com/rav4hybrid/ (last visited Jan. 30, 2020).
[6] *See* https://www.fueleconomy.gov/feg/Find.do?action=sbs&id=42187&id=41307 (last visited Jan. 30, 2020).
[7] Lynton, Adam, "The 2019 Toyota RAV4 Hybrid Will Have a 600-Mile Range," CarBuzz.com, https://carbuzz.com/features/the-2019-toyota-rav4-hybrid-will-have-a-600-mile-range (Apr. 5, 2018) (last visited Jan. 30, 2020).

find a gas station.[8]

19.     Based on pre-production testing and design failure mode analysis, early complaints to dealers and warranty claims, replacement part orders, complaints made to the National Highway Traffic Safety Administration ("NHTSA"), and complaints made to Defendant TMS, Defendants were aware of the Fuel Tank Defect in Class Vehicles but continued to misrepresent the fuel capacity of the Class Vehicles and their effective range on a single tank of gas, and further concealed the defect and its effects from Plaintiffs and members of the Classes.

20.     Knowledge and information regarding the Fuel Tank Defect and the associated safety risk of increased emissions, damage to the fuel system components, and fuel spillage while re-fueling, was in the exclusive and superior possession of Defendants and their authorized dealers and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence.  Despite Defendants' knowledge, Toyota continues to sell these defective vehicles, has failed to disclose the existence of the Fuel Tank Defect to directly to consumers, Plaintiffs, and members of the Classes, has not issued a recall, and has not remedied the defect and/or compensated Class Vehicle purchasers, owners, or lessees for this material defect.

21.     No reasonable consumer expects to purchase or lease a vehicle that contained a concealed Fuel Tank Defect which creates a safety hazard and effectively limits the fuel capacity and range of the vehicle. Moreover, no reasonable consumer expects Defendant to misrepresent the fuel tank capacity and range of the vehicle. The Fuel Tank Defect is material to Plaintiffs and members of the Classes because when they purchased or leased their Class

---

[8] Traugott, Jay, "2019 Toyota RAV4 Chief Engineer: Gas Station Trips Every Two Weeks Are a Waste of Time," CarBuzz.com, https://carbuzz.com/news/2019-toyota-rav4-chief-engineer-gas-station-trips-every-two-weeks-are-a-waste-of-time (Oct. 2, 2018) (last visited Jan. 30, 2020).

Vehicles, they reasonably expected that they would be able to fill their fuel tanks to the advertised capacity, especially given that Toyota has not warned that the full capacity of the fuel tank may not be available and the full range of the Class Vehicles would not be available. Had Defendants disclosed the Fuel Tank Defect, Plaintiffs and members of the Classes would not have purchased or leased their Class Vehicles or would have paid less for their Class Vehicles.

## THE PARTIES

**Plaintiff Steven Boulom**

22.    Plaintiff Steven Boulom is a California citizen who resides in Carson, California.

23.    On or around September 11, 2019, Plaintiff Boulom purchased a new 2019 Toyota RAV4 Hybrid XLE from Norwalk Toyota, an authorized Toyota dealer in Norwalk, California.

24.    Plaintiff Boulom purchased his Toyota RAV4 Hybrid vehicle primarily for personal, family, or household use.

25.    The miles-per gallon rating, the fuel tank capacity, and the vehicle's range were primary factors in Plaintiff Boulom's decision to purchase his vehicle. Plaintiff Boulom reviewed and carefully tracked the fuel tank capacity in the vehicles he was researching before making his purchasing decision, because vehicle range was of primary importance to him. Before purchase, and in early 2019, Mr. Boulom researched his vehicle on Toyota's official website. He also researched his prospective vehicle on the websites for Kelley Blue Book, Edmunds, True Car, and Auto Trader. He also was exposed to numerous advertisements regarding the RAV4 vehicle, including a billboard advertisement on the 605 highway. He reviewed and relied on advertisements boasting his vehicle's 580 mile range. Before visiting the Norwalk Toyota dealership, he

1  reviewed several dealership's websites regarding the RAV4 vehicle, and he

2  visited multiple Toyota dealerships, spoke with Toyota dealership personnel

3  regarding the RAV4 vehicle, and test drove several RAV4 vehicles. Finally, at

4  the Toyota Norwalk dealership, before purchase, Plaintiff Boulom reviewed the

5  Monroney Sticker or "window sticker" which listed official information about

6  the vehicle.

7      26.    Based on his research, Plaintiff Boulom believed that the 2019

8  Toyota RAV4 Hybrid XLE would provide both the promised fuel economy as

9  well as the capacity to hold 14.5 gallons of gas to deliver the advertised range.

10     27.    Toyota's misstatements and omissions were material to Plaintiff

11  Boulom, as was safety. Had Toyota disclosed the actual fuel tank capacity or the

12  Fuel Tank Defect, Mr. Boulom would have seen and been aware of that

13  information. Moreover, had Toyota disclosed its knowledge of the Fuel Tank

14  Defect before Mr. Boulom purchased his RAV4 Hybrid, Plaintiff Boulom would

15  have seen and been aware of the disclosures. Furthermore, had Mr. Boulom

16  known of the true fuel tank capacity of the RAV4 hybrid, or had he known of the

17  Fuel Tank Defect, Plaintiff Boulom would not have purchased his vehicle or

18  would have paid less for it.

19     28.    Approximately two weeks after purchase, Plaintiff Boulom realized

20  that his fuel tank was incapable of filling more than approximately 10 gallons of

21  fuel—far below the advertised 14.5 gallons.

22     29.    In or around October or November 2019, Plaintiff Boulom visited

23  Carson Toyota, an authorized Toyota dealership, complaining that his fuel tank

24  was unable to fill to capacity. Carson Toyota declined to perform any repairs and

25  told Mr. Boulom that they were unable to find any problems with Mr. Boulom's

26  vehicle. In fact, dealership recommended that Plaintiff Boulom use a gas station

27  other than Costco.

28

30.     Taking Toyota's agent's advice at face value, Plaintiff Boulom attempted to fuel his vehicle at a Chevron station. Predictably, fueling at a different gas station did not resolve the problem.

31.     Next, Plaintiff Boulom complained directly to Toyota. Toyota directed Plaintiff Boulom to return to his dealership. Accordingly, on January 3, 2020, Plaintiff Boulom brought his vehicle to Carson Toyota, an authorized Toyota dealership in Los Angeles County, California, complaining that his fuel tank was only able to accept approximately ten gallons. Remarkably, the Toyota dealership admitted in Plaintiff Boulom's repair orders that this was "a normal characteristic of this vehicle" and that the fuel tank's *true* capacity was "around 12 gallons." Ultimately, the dealership simply returned the vehicle to Plaintiff Boulom and told him that his vehicle was "operating correctly."

32.     Following the dealership visit, Plaintiff Boulom has continued to experience the Fuel Tank Defect. As a result, he does not achieve the advertised vehicle range, and he has to refill his vehicle more often than was promised and that he expected for a hybrid vehicle with a 14.5 gallon tank.

33.     At all times, Plaintiff Boulom, like all Class Members, has driven his Toyota RAV4 Hybrid in a manner that is and was both foreseeable, and in which it was intended to be used.

**Plaintiff Kathleen Champigny**

34.     Plaintiff Kathleen Champigny is a California citizen who resides in Alameda, California.

35.     In or around April 2019, Plaintiff Champigny purchased a new 2019 Toyota RAV4 Hybrid from Toyota of Marin, an authorized Toyota dealer in Marin, California.

36.     Plaintiff Champigny purchased her Toyota RAV4 Hybrid vehicle primarily for personal, family, or household use.

CLASS ACTION COMPLAINT

37.     The miles-per-gallon rating, the fuel tank capacity, and the vehicle's range were primary factors in Plaintiff Champigny's decision to purchase her vehicle. Before purchase, and in early 2019, Ms. Champigny researched her vehicle online. Before visiting the Toyota of Marin dealership, she reviewed several dealership's websites regarding the RAV4 vehicle. Plaintiff Champigny also reviewed the Monroney Sticker or "window sticker" which listed official information about the vehicle.

38.     Based on her research, Plaintiff Champigny believed that the 2019 Toyota RAV4 Hybrid XLE would provide both the promised fuel economy as well as the capacity to hold 14.5 gallons of gas to deliver a range of at least 535 DTE per tank of gas.

39.     Toyota's misstatements and omissions were material to Plaintiff Champigny, as was safety. Had Toyota disclosed the actual fuel tank capacity or the Fuel Tank Defect, Plaintiff Champigny would have seen and been aware of that information. Moreover, had Toyota disclosed its knowledge of the Fuel Tank Defect before Plaintiff Champigny purchased her RAV4 Hybrid, Plaintiff Champigny would have seen and been aware of the disclosures. Furthermore, had Plaintff Champigny known of the true fuel tank capacity of the RAV4 hybrid, or had she known of the Fuel Tank Defect, Plaintiff Champigny would not have purchased her vehicle or would have paid less for it.

40.     Shortly after purchase, and on the first occasion that Plaintiff Champigny had to fuel her vehicle, she found that she was unable to fill the tank to capacity. Moreover, far from the advertised 580 miles of range, Ms. Champigny's vehicle had a range in the mid 400s.

41.     In January 2020, Plaintiff Champigny contacted the Marin of Toyota dealership—Toyota's authorized agent for repairs—to complain about the Fuel Tank Defect. The dealership agent told her that the fuel tank refueling issue was

1   caused by the tank's shape.

2          42.    Plaintiff Champigny has continued to experience the Fuel Tank

3   Defect. As a result, she does not achieve the advertised vehicle range, and she

4   must refill her vehicle more often than was promised and than she expected for a

5   hybrid vehicle with a 14.5-gallon tank.

6          43.    At all times, Plaintiff Champigny, like all Class Members, has

7   driven her Toyota RAV4 Hybrid in a manner that is and was both foreseeable,

8   and in which it was intended to be used.

9   **Plaintiff Alanna Farber**

10         44.    Plaintiff Alanna Farber is a Pennsylvania citizen who resides in

11  Philadelphia, Pennsylvania.

12         45.    On or around August 10, 2019, Plaintiff Farber purchased a new

13  2019 Toyota RAV4 Hybrid LE from Sloane Toyota, an authorized Toyota dealer

14  located in Glenside, Pennsylvania.

15         46.    Plaintiff Farber purchased her vehicle for personal, family, or

16  household use.

17         47.    The MPGs and the vehicle's range based on stated fuel capacity

18  were primary factors in Plaintiff Farber's decision to purchase her vehicle.

19  Before purchasing her Class Vehicle, Plaintiff Farber reviewed the vehicle's

20  Monroney sticker (a.k.a. window sticker). Plaintiff Farber believed that the 2019

21  Toyota RAV4 Hybrid LE would provide both the promised fuel economy as well

22  as the capacity to hold 14.5 gallons of gas to deliver a range of at least 535 DTE

23  per tank of gas.

24         48.    Toyota's misstatements and omissions were material to Plaintiff

25  Farber. Had Toyota disclosed its knowledge of the Fuel Tank Defect before she

26  purchased her RAV4 Hybrid, Plaintiff Farber would have seen and been aware

27  of the disclosures. Furthermore, had she known of the Fuel Tank Defect, Plaintiff

28

1   Farber would not have purchased her vehicle or would have paid less for it.

2          49.    Since the first time she had to fill up the car with gasoline in August

3   2019, Plaintiff Farber noticed that the automatic shut-off clicks after only 8

4   gallons have poured into the tank.  She did not attempt to put any more gasoline

5   in the car.  When she checked the fuel gauge immediately thereafter, the gauge

6   read that the tank was only three quarters full.

7          50.    In or around November 2019, with approximately 5,500 miles on

8   the odometer, Plaintiff Farber's vehicle was taken to Sloane Toyota for its first

9   service. When the dealership's service technicians were informed that Plaintiff.

10  Farber was unable to fuel the vehicle to its advertised capacity, they stated that

11  they could not address her concerns at that appointment and advised that she

12  should make a separate appointment with a different department.

13         51.    Since the dealership visit, Plaintiff Farber has continued to

14  experience the Fuel Tank Defect, leading her to refill her vehicle more often than

15  she would have if the vehicle had performed as expected for a hybrid vehicle

16  with a 14.5 gallon tank.  In December 2019, she experienced an overflow of gas

17  out of the tank during a fill but her vehicle indicated that DTE was only in the

18  400 mile range.

19         52.    At all times, Plaintiff Farber, like all Class Members, has driven her

20  Toyota RAV4 Hybrid in a manner that is and was both foreseeable, and in which

21  it was intended to be used.

22  **Defendants**

23         53.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS"), is a

24  corporation organized and in existence under the laws of the State of California

25  and registered to do business in the State of California. TMS is headquartered at

26  6565 Headquarters Dr, Plano, TX 75024. TMS markets motor vehicles, parts,

27  and other products for sale in California, in the United States, and throughout the

28

world. TMS is the warrantor and distributor of Class Vehicles in California and throughout the United States.  Upon information and belief, TMS maintains the North American Parts Center in Ontario, California, which is responsible for shipping "goods to over 16 distribution centers across the US," and maintains the Los Angeles Parts Distribution Center in Torrance, California, which "provide[s] daily service to over 240 Toyota and Lexus Dealers across California and the western U.S."[9]

54.     Defendant Toyota Motor North America, Inc. ("TMNA"), is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. TMNA is headquartered at 6565 Headquarters Dr, Plano, TX 75024. According to Toyota's official website, TMNA "brings together Toyota's marketing, sales, engineering and manufacturing arms in North America on one shared, state-of-the-art campus."[10]

55.     TMNA also maintains offices in Torrance.  Additionally, TMNA's research and development offices are located in Gardena, California, where they are "engaged in engineering design, vehicle evaluation, powertrain development & calibration, regulatory affairs, and alternative powertrain research for Toyota and Lexus vehicles manufactured or sold in North America."[11]  The Gardena offices are also known as "Toyota Technical Center."  ("TTC").

56.     Founded in 1937 and headquartered in Toyota City, Japan, Defendant Toyota Motor Corporation ("TMC") is a corporation organized under the laws of Japan. TMC manufacturers and distributes automobiles, as well as

_____

[9] https://www.toyota.com/usa/operations/map.html#!/USCA (last visited Jan. 30, 2020)

[10] https://www.toyota.com/usa/operations/map.html#!/tcal (last visited Jan. 30, 2020)

[11] https://www.toyota.com/usa/operations/map.html#!/ttc_gardena (last visited Jan. 30, 2020)

parts for Toyota branded vehicles, and is the parent company of both TMS and TMNA. Upon information and belief, both the Class Vehicles, their fuel systems, and the fuel system's components, were manufacturer in Japan by TMC.

57. Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in California and Pennsylvania.

58. At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Riverside County and throughout the United States of America.

## JURISDICTION

59. This is a class action.

60. Members of the proposed Class, which includes citizens of all 50 states, or, in the alternative, California and Pennsylvania, are citizens of states other than Texas, where TMS and TMNA are headquartered, and California, where TMS and TMNA are incorporated.

61. On information and belief, aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

62. Accordingly, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

63. Defendants, through their businesses of marketing, distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate. Toyota is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

64. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)

1  because Plaintiff Boulom resides in the County of Carson, California. In

2  addition, Plaintiff Boulom's Declaration, as required under California Civil Code

3  section 1780(d) but not pursuant to *Erie* and federal procedural rules, reflects

4  that a substantial part of the events or omissions giving rise to the claims alleged

5  herein occurred, or a substantial part of property that is the subject of this action,

6  is situated in Riverside County, California. It is attached as Exhibit 1.

7  **FACTUAL ALLEGATIONS**

8       65.    Toyota has thousands of authorized dealerships across the United

9  States and controls the distribution of automobiles, parts, services, and warranty

10  repairs throughout the United States, all of which are under Toyota's control.

11  Toyota authorizes these distributors and dealerships to sell Toyota vehicles,

12  parts, and accessories and to service and repair Toyota vehicles using Toyota

13  parts.  Its operating income through those distributors and dealerships for its

14  North American region totaled $1.29 billion for the fiscal year ending March 31,

15  2019 on vehicle sales of over 2.7 million.[12] Toyota sells its vehicles to its

16  authorized distributors and dealerships, which in turn sell those vehicles to

17  consumers. After these dealerships sells cars to consumers, including the

18  Plaintiffs and Class members, they purchase additional inventory from Toyota to

19  replace the vehicles sold, increasing Toyota's revenues. Thus, Plaintiffs' and

20  Class Members' purchases of Class Vehicles accrue to the benefit of Toyota by

21  increasing its revenues.

22       66.    Since 2013, Toyota has been developing the fifth generation RAV4

23  and RAV4 hybrid. Toyota designed, manufactured, distributed, sold, and leased

24  the Class Vehicles. Toyota has sold, directly or indirectly, through dealers and

25  other retail outlets, thousands of Class Vehicles in California, Pennsylvania, and

26

27        [12] *See* "TMC Announces Financial Results for Fiscal Year Ended March 31, 2019," (May 8, 2019) https://pressroom.toyota.com/tmc-announces-financial-results-for-fiscal-year-ended-march-31-2019/ (last visited Jan. 30, 2020).

28

nationwide. Toyota warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

67.     While the Class Vehicles are hybrids, they also have an internal combustion engine fueled by gasoline. A functional fuel system requires proper venting, both to allow the accumulating gas vapors in the fuel tank to release safely and to allow air to escape so that fuel can take it place when being filled at a gas station.

68.     When a fuel system cannot properly vent air and gas vapors during the refueling process, the air the system should expel from the tank instead goes up the filler neck. This activates the mechanical pressure switch on the fuel pump, which informs the pump that the car is full and shuts off the flow of fuel. If the fuel tank cannot properly vent, the fuel efficiency of the vehicle can also suffer, emissions from the vehicle can increase, and the system itself can sustain damage.

69.     Upon information and belief, the Class Vehicles are equipped with fuel systems that do not properly vent the air and gas vapors from the fuel tanks, thus increasing emissions, reducing efficiency, and making it impossible to use the full capacity of fuel tank. This is in contrast to the 2019 and 2020 Toyota RAV4 non-hybrid models, which use a differently configured fuel system and different component parts.

CLASS ACTION COMPLAINT

70.     In the Class Vehicles, the fuel tank sits underneath the car, below the rear battery, as shown by the figure below.

71.     This differs from the setup of fifth generation RAV4 vehicles which use only a traditional gasoline-powered engine whose fuel tank straddles the



| | IG/POWER SW | | Fuse Box | | 12V Battery |
|---|---|---|---|---|---|
| | Airbag (incl. Inflator) | | Inflator | | High Voltage Battery |
| | High Voltage Components | | Fuel Tank | | Gas-filled Damper |
| | Seat Belt Pretensioner (Gas Generator) | | Structural Reinforcements | | Airbag Computer |

RAV4HV50_LHD_1

CLASS ACTION COMPLAINT

1  drive shaft, as shown by the figure below.

2        72.     The Class Vehicles are equipped with a fuel tank, ostensibly of

3  14.5-gallon capacity, which is latitudinal and whose Toyota part number is

4  770010R100. The tank appears in the diagram below, labeled "1." The vent tube



is Toyota part number 77404-0R200, which is labeled "14."

        73.     This setup differs significantly from the fifth generation RAV4



vehicles which only have gasoline engines.  They use a "saddle-shaped" fuel tank, Toyota part number 77001-0R090, labeled "1" in the diagram below, which straddles the drive shaft to the rear wheels.  The vent tube is part number 77016-0R020, labeled "17" in the diagram.

74.   Upon information and belief, the fuel systems in Class Vehicles were redesigned from the fuel system used in the fourth generation RAV4 Hybrids due both to the change in dimensions between the generations and to meet Toyota's stated goal of delivering a range of around 600 miles per tank. *See supra,* ¶¶ 17-18.

75.   Due to the Fuel Tank Defect and the insufficient venting of air and gas vapors, the Class Vehicles are unable to be filled to the capacity of their fuel tanks. Upon information and belief, the lack of proper venting causes unsafe emissions from Class Vehicles, damages the components of the fuel system such that they will have to be replaced sooner than anticipated, and creates a dangerous risk of overflow when consumers are filling their vehicles at gas stations.

76.   Indeed, the Fuel Tank Defect can force class members to attempt to "top-off" their fuel tanks in order to fill them. But topping off causes fuel spillage and the release of harmful gasoline vapors and is the subject of regulations at both the state and federal level. The California Air Resources Board (CARB) led the effort to certify gasoline vapor control systems and require their use, starting in 1974.  In 1990, the federal Clean Act (42 U.S.C. § 7401 *et seq*.) amendments included requirements that vapor recovery systems at gas stations use CARB-certified equipment. Such systems are "intended to limit the discharge to the atmosphere of gasoline vapors displaced during the dispensing of gasoline into motor vehicle fuel tanks." Since that time, vapor control systems have been enhanced, and new requirements have been applied on

an ongoing basis. To this end, CARB regulations require automobile fill pipes to accept a fill rate of 10 gallons per minute, and also require that no premature nozzle shut-off occur in 90 percent of the test repetitions for any test nozzle. However, in the class vehicles, the nozzle shuts off prematurely every time the vehicle is fueled, after only approximately 10 gallons of fuel have been added after the low fuel light has illuminated. Toyota is thus in violation of these regulations.

77.     As a result of the Fuel Tank Defect, class members are forced to top off their vehicles, which can defeat these mandated vapor control systems and cause the release of liquid gasoline and gasoline vapors into the environment, which causes an unreasonable risk to health and safety.

78.     Class Member complaints to NHTSA, cited *infra*, demonstrate the unsafe and widespread nature of the Fuel Tank Defect and Defendants' awareness that the Defect existed before selling the Class Vehicles to Plaintiffs.

**Toyota Had Superior and Exclusive Knowledge of the Fuel Tank Defect**

79.     Toyota had superior and exclusive knowledge of the Fuel Tank Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

80.     Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased or leased their respective Class Vehicles, and since pre-production road testing of the 2019 RAV4 Hybrid beginning in late 2017, if not earlier, Toyota knew about the Fuel Tank Defect through sources not available to consumers, including pre-release testing data, such as design mode failure analysis, early consumer complaints to Toyota and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from Toyota dealers about the problem.

Publicly available facts set forth *infra* further confirm Toyota's knowledge.

81.     Toyota is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Toyota conducts tests, including pre-sale durability testing, on vehicle components such as the fuels systems in Class Vehicles, to verify the parts are free from defect and align with Toyota's specifications.  Further, pre-production testing on vehicles and their components is designed to be harsher than expected "real-world" driving experience of consumers.  Such testing necessarily includes the filling and refilling of the vehicles' fuel tanks. Thus, Toyota knew or should have known that the fuel systems in Class Vehicles were defective and led to the inability of the fuel tank to be filled to capacity.

82.     Additionally, Toyota should have learned of this widespread defect from the sheer number of reports received from dealerships and from customer complaints directly to Toyota. Toyota's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

83.     Indeed, as of July 2019, many Class Members had already reported the Fuel Tank Defect directly to Toyota at Toyota's owners' forum at www.toyota.com, as well to various Toyota authorized dealerships.

84.     Toyota's warranty department analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Toyota's policy that when a repair is made under warranty, the dealership must provide Toyota with detailed documentation of the problem and the repair employed to correct it in order to be reimbursed. Dealerships have an incentive to provide detailed information to Toyota, because they will not be reimbursed for any repairs unless

1  the justification is sufficiently detailed.

2      85.    There have been other reports of the Fuel Tank Defect.  Kelley Blue

3  Book.com is conducting a long-term review of the 2019 Toyota RAV4 Hybrid

4  which began on July 26, 2019.  In the first report, the author noted:

> In the two fill-ups we've done so far, the only concern is that the low
> fuel warning has come on and the vehicle shows about 50-odd mile-
> range to empty, but we were only able to pump about 9 gallons into
> the tank. The specs show a 14.5-gallon capacity, so we're a bit
> puzzled by the disparity.[13]

86.    On the September 6, 2019 update, the issues continued, though the author wondered if the issue was simply Toyota being "conservative" with the dashboard readings:

> One of the aspects of our 2019 Toyota RAV4 Hybrid that I'm getting
> a handle on it's the disparity between the low fuel warning and the
> inability to put more than 12 gallons into the 14.5-gallon tank. I've
> concluded that Toyota is awfully conservative when it comes to its
> DTE (Distance to Empty) readings. On a full tank, the DTE will read
> more than 400 miles range, but by the time the low fuel light comes
> on and the distance left is showing under 50 miles, the trip odometer
> usually reads somewhere in the mid-300-mile range. You expect with
> a vehicle returning somewhere between 35 and 40 mpg with a 14.5-
> gallon tank would have a range upwards of 450 miles. Out on the open
> road, I hope to be able to stretch that out some and see what the
> practical range you can expect from the RAV4 despite what the
> warning lights tell you.[14]

87.    Toyota quietly issues notifications to its dealerships – but not consumers – called Technical Tips ("TTs") or Technical Service Bulletins ("TSBs.") Through TTs and TSBs, Toyota provides directions to its authorized

---

[13] "2019 Toyota RAV4 Hybrid Ownership Review,"
https://www.kbb.com/articles/reviews/2019-toyota-rav4-hybrid-ownership-review/ (last visit Jan. 30, 2020).

[14] *Id.*

dealerships for how to respond to customer complaints and requests for repairs.

88.     On November 5, 2019, TMS issued T-TT-0581-19, titled "Fuel Gauge" that applied to the 2019 RAV4 Hybrid. This TT stated that "Some 2019 model year RAV4 HV customers may be experiencing some concern related to the fuel gauge reading less than full." The TT directed technicians to "perform active test using Techstream to confirm fuel gauge operation." This TT claimed, "The concern is under investigation." On information and belief, this TT failed to resolve the Fuel Tank Defect. This TT was not issued as part of a formal recall or service campaign.

89.     On December 22, 2019, Automotive News reported that many owners of Class Vehicles were unable to fill their fuel tanks to capacity. Toyota issued a statement to Automotive News that it is "investigating a fuel tank shape issues on certain RAV4 Hybrid vehicles. In these cases, variations in fuel tank shape may prevent a full refill but up to several gallons. This condition may impact the vehicle's total available driving distance."[15]

90.     Automotive News further reported that "[a] spokesman for Toyota Motor North America declined to say how many RAV4 Hybrids are believed to be affected, nor would he provide other details of the ongoing investigation."[16]

91.     Class Members who have complained about the Fuel Tank Defect have received a number of different attempted repairs. One attempted repair is the replacement of a the "sending unit."[17] One Class Member received a software "update," as well as a new fuel tank, sending unit, and gasket replacement as seen below. These "repairs" appeared to correct the defect, but the defect reappeared as soon as she needed to refill the fuel tank.  The dealership where

---

[15] https://www.autonews.com/design/pain-pump-some-rav4-hybrid-owners (last visited Jan. 30, 2020).

[16] Id.

[17] https://www.rav4world.com/threads/have-you-had-trouble-filling-your-hybrid-gas-tank.300662/ (last visited Jan. 30, 2020).

1  she received these warranty repairs canceled a subsequent appointment per

2  "Toyota Corporate."[18]

3       92.    Other Class Members reported receiving a "software fix" such that

4  their gauges showed that the fuel tank was full, but still could only fill up to

5  about 11 gallons after driving their Class Vehicles to empty.[19]

| Job # 1 | | Labor Total: | $ 0.00 |
|---|---|---|---|

**CUSTOMER STATES THAT GAS TANK NEVER FILLS UP TO WHERE NEEDLE SHOWS AT FULL. WILL ONLY GET A FEW DASH MARKS UNDER THE F MARK, INSTALL SOP FUEL TANK AND SENDING UNIT.**
Cause:  TECH INSPECTED AND VERIFIED CONCERN. PER TAS CASE AND INSPECTIONS, REC REPLACE SENDING UNIT AND FUEL TANK...SENDING UNIT NOT READING ACCURATELY AND FUEL TANK BLADDER NOT ALLOWING TANK TO FILL PROPERLY
Correction:  INSTALLED NEW FUEL TANK AND SENDING UNIT AND ADDED FUEL...GAUGE AND MILEAGE DISPLAY IS READING ACCURATELY NOW...

| Part Number | Part Description | Parts Total: | $ 0.00 |
|---|---|---|---|
| TO77001-0R100 | TANK SUB-ASSY, FU | | |
| TO83320-0R050 | GAGE ASSY, FUEL S | | |
| TO77169-06060 | GASKET, FUEL SUCT | | |

| **Job # 1 Total** | **$0.00** |
|---|---|

     93.    Toyota has even completed a number of vehicle repurchases, also known as buy-backs, from dissatisfied consumers who reported the Fuel Tank Defect and were unable to receive warranty repairs that resolved the defect. Upon information and belief, multiple buybacks were completed in or before October 2019.[20]

     94.    On information and belief, no Class Member has received a repair from Toyota or any Toyota authorized dealer which resolves the Fuel Tank Defect.

     95.    In addition, Toyota monitors customers' complaints made to NHTSA. Federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal

---

[18] https://www.cargurus.com/Cars/Discussion-t84539_ds1052289
[19] *Id.*
[20] *Id. See also* https://www.rav4world.com/threads/toyota-repurchased-my-car.302687/

1  requirement (backed by criminal penalties) compelling the confidential

2  disclosure of defects and related data by automakers to NHTSA, including field

3  reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No.

4  106-414, 114 Stat.1800 (2000).

5      96.    Automakers have a legal obligation to identify and report emerging

6  safety-related defects to NHTSA under the Early Warning Report requirements.

7  *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints

8  regarding their automobiles as part of their ongoing obligation to identify

9  potential defects in their vehicles, including safety-related defects. *Id.* Thus,

10  Toyota knew or should have known of the many complaints about the Fuel Tank

11  Defect logged by NHTSA Office of Defect Investigation (ODI), and the content,

12  consistency, and large number of those complaints alerted, or should have

13  alerted, Toyota to the Fuel Tank Defect.

14      97.    The following are but a few examples of the over 100 complaints

15  from owners and lessees of the Class Vehicles concerning the Fuel Tank Defect

16  available through NHTSA's website, www.safercar.gov. The volume of

17  complaints that consumers have made to the federal government to date is

18  compelling, particularly given that the class vehicles were only recently made

19  available for sale. Spelling and grammar mistakes appear as in original.

20

21      a. **DATE OF INCIDENT:**    June 15, 2019
          **DATE COMPLAINT FILED:**    June 20, 2019
22          **NHTSA/ODI ID:**    11221492
          **SUMMARY:** WHEN FILLING MY TANK, AUTO-SHUTOFF
23          HAPPENS WHEN THE TANK IS AT LEAST 2 GALLONS SHY OF
          BEING FULL.  I KNOW THIS BECAUSE MY GAS GAUGE DOES
24          NOT INDICATE FULL AND I AM ABLE TO ADD ADDITIONAL
          2-2.5 GALLONS TO MY TANK, THOUGH IT TAKES A WHILE
25          BECAUSE I HAVE TO PUSH THROUGH ALL THE AUTO
          SHUTOFFS.  IT HAPPENS EVERY TIME I FILL UP
26          REGARDLESS OS THE STATION I'M FUELING AT.
27

28

b. **DATE OF INCIDENT:**    June 24, 2019
   **DATE COMPLAINT FILED:**    June 24, 2019
   **NHTSA/ODI ID:**    11222043
   **SUMMARY:** FUEL TANK DOES NOT FILL UP TO FULL.
   RANGE ADVERTISED AS WELL OVER 500 MILES BUT USUAL
   RANGE AFTER FILL UP IN 400S.

c. **DATE OF INCIDENT:**    June 1, 2019
   **DATE COMPLAINT FILED:**    July 6, 2019
   **NHTSA/ODI ID:**    11229761
   **SUMMARY:** THE FUEL SAYS EMPTY BUT ONLY TAKES 9
   GALLONS ON A 14 GALLON TANK. THE DEALER SAID THAT
   WE ARE NOT THE ONLY ONES THIS IS HAPPENING TO AND
   TOYOTA IS WORKING ON IT. MY SISTER-IN-LAW BOUGHT
   ONE A WEEK BEFORE US AND SHE IS HAVING THE SAME
   PROBLEM.

d. **DATE OF INCIDENT:**    July 8, 2019
   **DATE COMPLAINT FILED:**    July 9, 2019
   **NHTSA/ODI ID:**    11230375
   **SUMMARY:** THERE IS AN INABILITY TO COMPLETELY FILL
   UP THE GAS TANK.  EVEN WHEN REACHING THE EMPTY
   READING ON THE GAS GAUGE, THE CAR ONLY SEEMS TO
   FILL 9.5-10 GALLONS OF FUEL. THE ARE IS ADVERTISED AS
   A 14.5 GALLON TANK, BUT IT IS IMPOSSIBLE TO GET THAT
   MUCH FUEL INTO THE TANK.

e. **DATE OF INCIDENT:**    July 1, 2019
   **DATE COMPLAINT FILED:**    July 19, 2019
   **NHTSA/ODI ID:**    11233443
   **SUMMARY:** FUEL TANK CAPACITY 14.5 GALLONS CAN
   ONLY BE FILLED TO 9.5 GALLONS WITHOUT AGGRESSIVE
   "TOPPING OFF."   IN ORDER TO AVOID POSSIBLE
   ENVIRONMENTAL   HARM   AND   VEHICLE   EMISSION
   CONTROL DAMAGE, TOPPING OFF NOT USED. HOWEVER,
   THIS LEAVES THE VEHICLE 5 GALLONS SHORT OF A FULL
   TANK (ABOUT 200 MILE RANGE LOSS)

f. **DATE OF INCIDENT:**    June 13, 2019

**DATE COMPLAINT FILED:** July 26, 2019
**NHTSA/ODI ID:** 112235113
**SUMMARY:** TANK WILL NOT FILL TO FULL. SEVERAL GALLONS LESS. APPROXIMATELY 3/4 TANK IS ALL THAT IT WILL ACCEPT.

g. **DATE OF INCIDENT:** July 29, 2019
**DATE COMPLAINT FILED:** July 29, 2019
**NHTSA/ODI ID:** 11240389
**SUMMARY:** MY 2019 TOYOTA RAV4 HYBRID HAS A 14.5 GALLON FUEL TANK. I BOUGHT IT NEW TOW MONTHS AGO AND HAVE ALMOST 5,000 MILES ON IT. IN THE TWO MONTHS SINCE I'VE OWNED IT, THE FUEL TANK HAS NEVER ALLOWED ME TO FILL IT MORE THAN 11 GALLONS. IF I TRY TO TOP IT OFF, IT WILL JUST CONTINUALLY CLICK OFF EVERY COUPLE CENTS. THIS AN ONGOING PROBLEM, NOT A ONE TIME EVENT.

h. **DATE OF INCIDENT:** August 2, 2019
**DATE COMPLAINT FILED:** August 8, 2019
**NHTSA/ODI ID:** 11242443
**SUMMARY:** FUEL TANK DOES NOT PROPERLY FILL, AND OFTEN RESULTS IN GAS SPILLING OUT OF THE VEHICLE AS AN OWNER IS FORCED TO MANUALLY "TOP OFF" THE VEHICLE TO FILL THE TANK. OTHERS ARE EXPERIENCING THIS SAME ISSUE: HHTTPS://WWW.RAV4WORLD.COM/THREADS/DIIFFICULTY-WITH-GETTING-FUEL-TANK-FULL.298909/

i. **DATE OF INCIDENT:** August 18, 2019
**DATE COMPLAINT FILED:** August 27, 2019
**NHTSA/ODI ID:** 11251850
**SUMMARY:** WHEN FUELING, HOSE STOPS AND CLICKS, BUT TANK ONLY READS A LITTLE BIT OVER 3/4 FULL. WHEN TOPPING OFF MULTIPLE TIMES (WHICH THE GAS STATION ADVISES NOT TO DO), TANK READS UP TO 7/8 MAX. TANK FILLS LITTLE OVER 10 GALS, BUT MARKETED AT 14.5.

j. **DATE OF INCIDENT:** September 4, 2019
**DATE COMPLAINT FILED:** September 5, 2019

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NHTSA/ODI ID:**    11253483

**SUMMARY:** MY 2019 RAV4 XSE HYBRID MODEL WAS RECENTLY PURCHASED AND I BEGAN TO NOTICE SOME DISCREPANCIES IN WHAT THE VEHICLE HAD ADVERTISED FOR DTE VERSUS SIZE OF THE TANK. THE VEHICLE'S MANUAL SAYS THIS CAR HAS A 14.5 GALLON TANK, BUT THE LAST 3 TIMES I HAD TONE TO REFILL, THE PUMP USUALLY SHUTS OFF AROUND 9-11 GALLONS AND THE METER JUMPS BACK TO THE FULL MARK.  THE MANUAL ALSO SAYS THERE'S A 2.2 GALLON RESERVE FOR SAFETY, BUT THAT MATH DOES NOT ADD UP TO HOW MUCH I FILL UP THEN THE GAS LIGHT TURNS ON. 30MI LEFT ON DTE, I USUALLY RUN IT UNTIL I HAVE ABOUT 10MI LEFT AND THEN THEN UPON REFUEL I BARELY BREAK THE 10 GALLON MARK, SO WHERE'S THE OTHER 2.3 GALLONS (MINUS THE 2.2 RESERVE)? I CURRENTLY GET ON TOTAL AVERAGE 38.8 MPG. AFTER A FULL REFILL, THE NEEDLE IS AT THE FULL MARK, MY DTE AT THE TIME USUALLY REPORTS 475 MPG, BUT EACH TIME MY REFILL LIGHT COMES ON, MY ODO METER (I RESET EACH TIME AT REFUEL) ONLY HAS ME AT ABOUT 380-400 MILES DRIVEN. NOW, I GET THAT DTE DYNAMICALLY CHANGES, BUT WITH OVER 100 ESTIMATE MILES DIFFERENCE? THAT'S COMPLETELY INSANE AND FALSE ADVERTISING. I'VE ALSO NOTICED THAT EVERYTIME I RESTART MY CAR, THE DTE ALWAYS SOMEHOW LOSES A FEW MILES FROM THE LAST REPORTED NUMBER. SO SAY I HAVE 400 MILES AND DROVE 20 IN TRIP A (DTE ~380MI), I WOULD TURN OFF THE CAR, TURN IT BACK ON, AND THE DTE WOULD REPORT 373 OR SOMETHING IN THAT BALLPARK. EACH AND EVERY TIME THE DTE ALWAYS SEEMS TO REDUCE UPON ENGINE START, WHICH GETS ME CLOSER TO MY TOTAL MILEAGE BY REFUEL AROUND 380..A FAR CRY FROM THE INITIAL ~475MI. THERE'S BEEN NUMBEROUS REPORTS FROM OTHERS REGARDING THE SAME ISSUE AND IT'S COMPLETELY DISHEARTENING TO HAVE SPENT SO MUCH MONEY ON A HYBRID VEHICLE NO LESS THAN I CAN HARDLY GET 400 MILES ON A FULL TANK WITH A CONSTANTLY FLUCTUATING DTE MEASUREMENT.

k. **DATE OF INCIDENT:**    July 15, 2019

**DATE COMPLAINT FILED:** September 8, 2019
**NHTSA/ODI ID:** 11253943
**SUMMARY:** VEHICLE WILL ONLY FILL 9.5GAL AT PUMP. REQUIRES NOT RECOMMENDED FORCE PUMPING IN ORDER TO ACHIEVE FULL TANK. VEHICLE SYSTEM GUAGE WILL INCORRECTLY READ FULL DESPITE MISSING 4-5GALLONS. FUEL GUAGE RAPIDLY DROPS QUICKLY. IHAVE GIVEN TOYOTA 4 VISIT TO FIX THE ISSUE. THEY HAVE REPLACED FUEL SYSTEM BUT ISSUE PERSIST.

l.   **DATE OF INCIDENT:** April 13, 2019
     **DATE COMPLAINT FILED:** September 13, 2019
     **NHTSA/ODI ID:** 112555325
     **SUMMARY:** THE FUEL TANK IS EITHER UNABLE TO FILL TO THE RATED CAPACITY OR IS OUT OF CALIBRATION. THIS CAUSES THE STATION PUMP TO STOP PROVIDING FUEL BEFORE THE TANK IS FULL.  IN ORDER TO OBTAIN ANYWHERE NEAR A FULL TANK OF GAS YOU MUST IGNORE THE PUMPS AUTOMATIC SHUTOFF AND GUESS TO WHEN TO STOP. THIS IS CLEARLY A SAFETY ISSUE AS NOT KNOWING WHEN TO STOP CAN CAUSE FUEL TO SPILL TO FROM THE VEHICLE. THIS HAS BEEN HAPPENING SINCE THE FIRST FILL UP OF THE VEHICLE IN APRIL OF 2019 AND CONTINUES TO THIS DAY (SEPTEMBER 2019). TOYOTA HAS REPLACED THE FUEL SENDING UNIT THE ISSUE STILL PERSISTS. THEY HAVE NOT ISSUED ANY SERVICE BULLETINS OR WARNINGS REGARDING THIS ISSUE BUT CLAIM IT IS WIDESPREAD FOR THE 2019 RAV4 HYBRID. THEY ALSO CLAIM NO MORE REPAIR ATTEMPTS WILL BE MADE AS THEY DO NOT KNOW WHAT THE ISSUE IS OR HOW TO FIX IT.

m.  **DATE OF INCIDENT:** May 7, 2019
    **DATE COMPLAINT FILED:** October 1, 2019
    **NHTSA/ODI ID:** 11265474
    **SUMMARY:** TL* THE CONTACT OWNS A 2019 TOYOTA RAV4. WHEN THE FUEL TANK WAS FILLED, IT REGISTERED 3/4 FULL INSTEAD OF COMPLETELY FULL. THE VEHICLE WAS TAKEN TO BIG TOW TOYOTA OF CHANDLER (480-3024651, LOCATED AT 1250 S GILBERT RD, CHANDLER, AZ 85286), BUT THE FAILURE COULD NOT BE DUPLICATED.

THE TECHNICIAN STATED THAT IT COULD BE A DESIGN FLAW WITH THE FUEL TANK. THE FAILURE WAS NOT REMEDIED. THE MANUFACTURER STATED THAT THE FAILURE WAS A KNOWN ISSUE AND A CLAIM MANAGER WOULD CALL THE CONTACT. THE CONTACT WAS NOT CALLED BACK. THE FAILURE MILAGE WAS APPROXIMATELY 200.

98. Toyota owners also reported the Fuel Defect in online forums:

**Cargurus.com – 2019 Toyota RAV4 XSE Hybrid Fuel / Range Gauge Discrepancy (October 7, 2019)**

Posted by GRAV4 on Oct 7, 2019: I bought a new 2019 RAV4 XSE Hybrid in California in August. The range on the trip computer has only been around 400-450 miles every time I fuel up. I have been average 35-39 MPG per tank, but when I refuel (when the gauge is on empty and the computer says "Refuel"), the tank only takes 11-12 gallons before clicking off and showing full on the fuel gauge. Recently, run the fuel gauge down WAY past empty (30-60 miles) after it says "Refuel" and when I fill it up, I can still only get about 12 / 12.5 gallon in the tank. The vehicles should have 100+ more miles range as there are 2.5 gallons left in the tank, even when the gauge is way below empty (see photo). The fuel gauge and trip computer clearly need recalibrating. This is driving me crazy! I called Toyota and they said there was a 2 gallon reserve – but that still doesn't account for the range / gauge discrepancy. I am going to call Toyota again and file a complaint. I'll tell the service department about it when I bring it in for the 5K service in a few months.

Is anyone dealing with the same issue or found a solution from Toyota??
Please advise. Thanks!

1
2
3
4
5
6
7
8
9
10



11
12

**Cargurus.com – Gauge on my 2019 Hybrid Rav4**

13

Posted by Guru17CC8 on Sep 30, 2019: I just bought a 2019 Rav4
Hybrid and when I put gas in it only goes to 3/4 full. This has caused
me to stop more often to get gas as I cannot fill it up all of the way! Is
there a reason his has not been addressed? I also asked when I was in
the process of buying the car if there were any downside issues with
this vehicle and nothing.

14
15
16
17

**Cargurus.com – 2019 RAV4 advertised ~550+ miles range, but not
true for mine?**

18

Posted by GuruS3H54 on Jun 22, 2019: I bought a 2019 Toyota RAV4
Hybrid a couple months ago. I like it for the most part, but one of the
primary reasons I bought it was for the advertised ~550 mile range.
However, every time I've put in a full tank, the "mile range" at the
front dash shows around 430 miles.. I understand the advertised may
not be the same as real life, but a 100+ mile range difference seems
quite excessive. Is this normal? Does anyone else have this problem?

19
20
21
22
23
24
25

99.     The existence of the Fuel Tank Defect is a material fact that a

26

reasonable consumer would consider when deciding whether to purchase or lease

27

a Class Vehicle. Had Plaintiffs and other Class Members known of the Fuel Tank

28

Defect, they would have paid less for the Class Vehicles or would not have

1    purchased or leased them.

2        100.   Reasonable consumers, like Plaintiffs, reasonably expect that a

3    vehicle's fuel systems are safe, will function in a manner that will not pose a

4    safety risk, and are free of defects, all of which were not true with respect to the

5    fuel systems in the Class Vehicles. They also expected that the Class Vehicles

6    would be fit for the ordinary purpose of being capable of being fully fueled and

7    would confirm to the promises and affirmations on their window stickers which

8    they could not due to the Fuel Tank Defect. Plaintiffs and Class Members further

9    reasonably expected that Toyota would not sell or lease vehicles with known

10   safety defects which can increase emissions and present a overflow risk during

11   fueling, such as the Fuel Tank Defect, and will disclose any such defects to its

12   consumers when it learns of them. They did not expect Toyota to fail to disclose

13   the Fuel Tank Defect to them and to continually deny it.

14            **Toyota Has Actively Concealed the Fuel Tank Defect**

15       101.   Despite knowing of the existence of the Fuel Tank Defect, Toyota

16   has and continues to market the Class Vehicles as having a 14.5 capacity fuel

17   tank, displaying the vehicles with window stickers which show a range of 580

18   miles per tank, and advertises about the range and other fuel efficient advantages

19   of the Class Vehicles

20       102.   In the brochure for the 2019 RAV4 Hybrid, Toyota prominently

21   declared that "you might be surprised how far it takes you."[21]



103.   Toyota also continues to list the fuel capacity of Class Vehicles as 14.5 gallons, without mentioning that consumers may not be able to fill their fuel tanks to capacity.[22]

104.   Toyota also proclaims on its website that "Hybrids have a fuel tank just like every other vehicle.  The only difference is the number of times you need to visit the pump."[23]  Indeed, as stated by the chief engineer of the RAV4 hybrid, less trips to the gas station was the goal of the fifth generation RAV4 Hybrids.

105.   A video posted on the Toyota website also promises that RAV4 Hybrids will have less trips to the gas station per year due to the 14.5 gallon tank in combination with its estimated MPG rating.[24]



_____

[22] https://www.toyota.com/rav4/features/mpg/4444/4456/4454 (last visited Jan. 30, 2020).

[23] https://www.toyota.com/alternative-fuel/ (last visited Jan. 30, 2020).

[24] *Id.*

106.   Instead, due to the Fuel Tank Defect, the Class Vehicles have a range on a tank much closer to that the regular RAV4, which delivers 30 MPG on a 14.5 gallon tank, of about 435 miles despite the fact that Class Members have paid a premium for the Hybrid version.

107.   Furthermore, multiple Toyota authorized dealerships—Toyota's authorized agents—advertise the range of the RAV4 hybrid to be in the 500+ mile range. For example, Manhattan Beach Toyota advertises that the 2019 RAV4 Hybrid has a fuel tank capacity of 14.5 gallons, which "creates a driving range of between 536.5 miles and 594.5 miles with a full tank of gas."[25]  Serra Toyota advertises that "2020 Toyota RAV4 Hybrid provides drivers with an impressive driving range. The RAV4 Hybrid can travel between 551 highway miles and 594.5 city miles on just one tank of gas. With this kind of range, drivers are able to travel further and for longer without as many stops at the pump."[26]

108.   Despite its knowledge of the Fuel Tank Defect in the Class Vehicles, Toyota actively concealed the existence and nature of the defect from Plaintiffs and Class Members. As late as October 2019, a mere month before issue a TT regarding the defect, Toyota was informing consumers who called its corporate offices that "there are no reports of any similar issues in our database."[27]

109.   Toyota has not revised its advertising or informed potential purchasers and lessees that the fuel tank cannot be filled to capacity and comes

---

[25] "How Fuel-Efficient is the 2019 RAV4 Hybrid?", https://www.manhattanbeachtoyota.com/blog/2019-toyota-rav4-hybrid-fuel-economy-and-driving-range/ (Feb. 4, 2019) (last visited Jan. 30, 2020).

[26] "What Kind of Driving Range Does the 2020 Hybrid Offer?", https://www.serratoyota.com/blog/2020-toyota-rav4-hybrid-fuel-economy-and-engine-specs/ (Dec. 23, 2019) (last visited Jan. 30, 2020).

[27] https://www.cargurus.com/Cars/Discussion-t84539_ds1052289 (last visited Jan. 30, 2020).

1    with a corresponding safety risk.

2        110. Specifically, Toyota failed to disclose or actively concealed at and

3    after the time of purchase, lease, or repair:

4            (a) any and all known material defects or material nonconformity

5               of the Class Vehicles, including the defects pertaining to the

6               fuel systems;

7            (b) that the Class Vehicles, including the fuel systems, were

8               unsafe, not in good in working order, were defective, were in

9               need of repair and possibly recalibration or other software

10              mechanisms, and were not fit for their intended or particular

11              purposes; and

12           (c) that the Class Vehicles and the fuel systems were defective,

13              despite the fact that Toyota learned of such defects as early as

14              2018 during pre-production testing.

15                   **CLASS ACTION ALLEGATIONS**

16       111. Plaintiffs bring this lawsuit as a class action on behalf of themselves

17   and all others similarly situated as members of the proposed Class pursuant to

18   Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the

19   numerosity, commonality, typicality, adequacy, predominance, and superiority

20   requirements of those provisions.

21

22

23

24

25

26   ///

27   ///

28

112.   The Class and Sub-Class are defined as:

> **Class**:   All individuals in the United States who purchased or leased a 2019 or 2020 RAV4 Hybrid.
>
> - **California Sub-Class**:  All members of the Class who reside in or purchased their Class Vehicles in the State of California.
> - **Pennsylvania Sub-Class**:  All members of the Class who reside in the Commonwealth of Pennsylvania.
> - **CLRA Sub-Class**:  All members of the Class who are "consumers" within the meaning of California Civil Code § 1761(d).
> - **Implied Warranty Sub-Class**:  All members of the Class who purchased or leased their vehicles in the State of California.

113.   Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or division in which Defendants has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

114.   <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, upon information and belief, tens of thousands of Class Vehicles have sold in the United States, and thousands within California and Pennsylvania.  The number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from

1    information and records in Defendants' possession, custody, or control, as well
2    as from records kept by the Department of Motor Vehicles.

3        115.    Typicality: Plaintiffs' claims are typical of the claims of the Class in
4    that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle
5    designed, manufactured, and distributed by Toyota. The representative Plaintiffs,
6    like all Class Members, have been damaged by Defendants' misconduct in that
7    they have incurred or will incur the cost of repairing or replacing the defective
8    fuel systems. Furthermore, the factual bases of Toyota's misconduct are common
9    to all Class Members and represent a common thread resulting in injury to the
10   Class.

11       116.    Commonality: There are numerous questions of law and fact
12   common to Plaintiffs and the Class that predominate over any question affecting
13   Class Members individually. These common legal and factual issues include the
14   following:

15            (a)    Whether Class Vehicles suffer from the Fuel Tank Defect;
16            (b)    Whether the defects relating to the fuel system constitute an
17                   unreasonable safety risk;
18            (c)    Whether Defendants have knowledge of the Fuel Tank Defect
19                   and, if so, how long Defendants has known of the defect;
20            (d)    Whether the defective nature of fuel tank constitutes a
21                   material fact;
22            (e)    Whether Defendants has a duty to disclose the Fuel Tank
23                   Defect to Plaintiffs and Class Members;
24            (f)    Whether Plaintiffs and the other Class Members are entitled
25                   to equitable relief, including a preliminary and/or permanent
26                   injunction;
27            (g)    Whether Defendants knew or reasonably should have known
28

CLASS ACTION COMPLAINT

1     of the Fuel Tank Defect before they sold and leased Class

2     Vehicles to Class Members;

3     (h)   Whether Defendants should be declared financially

4           responsible for notifying the Class Members of problems with

5           the Class Vehicles and for the costs and expenses of repairing

6           and replacing the defective fuel system;

7     (i)   Whether Defendants are obligated to inform Class Members

8           of their right to seek reimbursement for having paid to

9           diagnose, repair, or replace their defective fuel systems;

10    (j)   Whether Defendants breached the implied warranty of

11          merchantability pursuant to the Magnuson-Moss Warranty

12          Act;

13    (k)   Whether Defendants breached the implied warranty of

14          merchantability pursuant to the Song-Beverly Act;

15    (l)   Whether Defendants breached their express warranties under

16          UCC section 2301;

17    (m)   Whether Defendants breached written warranties pursuant to

18          the Magnuson-Moss Warranty Act;

19    (n)   Whether Defendants breached the Consumer Legal Remedies

20          Act, Cal. Civ. Code § 1750, *et seq.*;

21    (o)   Whether Defendants breached the Unfair Competition Law,

22          Cal. Bus.  Prof. Code § 17200, *et seq.*;

23    (p)   Whether Defendants breached the Pennsylvania Unfair Trade

24          Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§

25          201-1, *et seq.*;

26    (q)   Whether Defendants were unjustly enriched by their actions;

27          and

28

CLASS ACTION COMPLAINT

1
2

(r)     Whether damages, restitution, equitable, injunctive,

compulsory or other relief are warranted.

3      117.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately

4  protect the interests of the Class Members. Plaintiffs have retained attorneys

5  experienced in the prosecution of class actions, including consumer and product

6  defect class actions, and they intend to prosecute this action vigorously.

7      118.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have

8  all suffered and will continue to suffer harm and damages as a result of

9  Defendants' unlawful and wrongful conduct. A class action is superior to other

10  available methods for the fair and efficient adjudication of the controversy.

11  Absent a class action, most Class Members would likely find the cost of

12  litigating their claims prohibitively high and would therefore have no effective

13  remedy. Because of the relatively small size of the individual Class Members'

14  claims, it is likely that only a few Class Members could afford to seek legal

15  redress for Defendants' misconduct. Absent a class action, Class Members will

16  continue to incur damages, and Defendants' misconduct will continue without

17  remedy or relief.  Class treatment of common questions of law and fact would

18  also be a superior method to multiple individual actions or piecemeal litigation in

19  that it will conserve the resources of the courts and the litigants and promote

20  consistency and efficiency of adjudication.

21              **FIRST CAUSE OF ACTION**

22          **VIOLATION OF CALIFORNIA'S CONSUMERS**

23              **LEGAL REMEDIES ACT,**

24          **CALIFORNIA CIVIL CODE § 1750, *ET SEQ*.**

25  **(On behalf of PlaintiffS Steven Boulom and Kathleen Champigny and Class,**

26      **or, alternatively, the CLRA Sub-Class, against All Defendants)**

27      119.   Plaintiffs Steven Boulom and Kathleen Champigny incorporate by

28

reference the allegations contained in paragraphs 1 through 118, *supra*.

120.   Plaintiffs Steven Boulom and Kathleen Champigny bring this cause of action on behalf of himself and the Class, or, alternatively, the CLRA Sub-Class.

121.   Defendants are "persons" as defined by California Civil Code § 1761(c).

122.   Plaintiffs Steven Boulom and Kathleen Champigny and CLRA Sub-class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

123.   By failing to disclose and concealing the defective nature of the fuel systems from Plaintiffs Steven Boulom and Kathleen Champigny and prospective Class Members, Toyota violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their fuel tanks had characteristics and benefits that they do not have and represented that the Class Vehicles and their fuel systems were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

124.   Toyota's unfair and deceptive acts or practices occurred repeatedly in Toyota's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

125.   Toyota knew that the Class Vehicles and their fuel systems suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

126.   Because of their reliance on Toyota's misstatements about the capacity of the fuel tank and omissions regarding the existence of the Fuel Tank, owners and/or lessees of the Class Vehicles, including Plaintiffs Steven Boulom and Kathleen Champigny, suffered an ascertainable loss of money, property,

and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, Plaintiffs Steven Boulom and Kathleen Champigny and Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to require repair and/or replacement.

127.   Toyota was under a duty to Plaintiffs Steven Boulom and Kathleen Champigny and Class Members to disclose the defective nature of the fuel system and/or the associated safety risk because:

        (a)   Toyota was in a superior position to know the true state of facts about the Fuel Tank Defect in Class Vehicles;

        (b)   Plaintiffs Steven Boulom and Kathleen Champigny and Class Members could not reasonably have been expected to learn or discover that the fuel system in Class Vehicles had a dangerous safety defect until it manifested; and

        (c)   Toyota knew that Plaintiffs Steven Boulom and Kathleen Champigny and Class Members could not reasonably have been expected to learn of or discover the Fuel Tank Defect.

128.   In advertising and continuing to advertise that the Class Vehicles had a 14.5-gallon fuel capacity with a concomitant range, Toyota knowingly and intentionally misrepresented the true nature of the Class Vehicles.

129.   In failing to disclose the defective nature of fuel system, Toyota knowingly and intentionally concealed material facts and breached its duty not to do so.

130.   The facts Toyota misstated to, concealed from, or failed to disclose to Plaintiffs Steven Boulom and Kathleen Champigny and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or whether to pay less for the Class Vehicles.  Had Plaintiffs Steven Boulom and Kathleen

1   Champigny and Class Members known that the Class Vehicles' fuel systems
2   were defective, they would not have purchased or leased the Class Vehicles or
3   would have paid less for them.

4       131.   Plaintiffs Steven Boulom and Kathleen Champigny and Class
5   Members are reasonable consumers who do not expect the fuel systems installed
6   in their vehicles to exhibit problems such as the Fuel Tank Defect. This is the
7   reasonable and objective consumer expectation relating to a vehicle's fuel tank
8   and its ability to be filled to capacity.

9       132.   Because of Toyota's conduct, Plaintiffs Steven Boulom and
10  Kathleen Champigny and the CLRA Class Members were harmed and suffered
11  actual damages in that, on information and belief, the Class Vehicles experienced
12  and will continue to experience problems such as the Fuel Tank Defect.

13      133.   As a direct and proximate result of Defendants' unfair or deceptive
14  acts or practices, Plaintiffs Steven Boulom and Kathleen Champigny and the
15  CLRA Class Members suffered and will continue to suffer actual damages.

16      134.   Plaintiffs Steven Boulom and Kathleen Champigny and the CLRA
17  Class are entitled to equitable relief.

18      135.   Plaintiffs Steven Boulom and Kathleen Champigny are providing
19  Toyota with notice of its violations of the CLRA pursuant to California Civil
20  Code § 1782(a). If, within 30 days of notice, Toyota does not provide
21  appropriate relief for its violations of the CLRA, Plaintiffs Steven Boulom and
22  Kathleen Champigny will seek monetary, compensatory, and punitive damages,
23  in addition to the equitable relief they seek now.

24

25

26

27

28

1
2
3
4
5

**SECOND CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS**

**CODE § 17200,** *et seq.*

**(On behalf of PlaintiffS Steven Boulom and Kathleen Champigny and Class,**

**or, alternatively, the California Sub-Class, against All Defendants)**

6
7

136.   Plaintiffs Steven Boulom and Kathleen Champigny incorporate by reference the allegations contained in paragraphs 1 through 118, *supra*.

8
9
10

137.   Plaintiffs Steven Boulom and Kathleen Champigny bring this cause of action on behalf of themselves and the Class, or, alternatively, on behalf of the California Sub-Class.

11
12
13
14
15
16
17
18

138.   Because of their reliance on Toyota's misstatements and omissions, owners and/or lessees of the Class Vehicles, including Plaintiffs Steven Boulom and Kathleen Champigny, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, Plaintiffs Steven Boulom and Kathleen Champigny and California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to require repair or replacement well before the end of the design life of the components.

19
20
21

139.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

22
23
24

140.   Plaintiffs Steven Boulom and Kathleen Champigny and California Sub-Class Members are reasonable consumers who do not expect their fuel systems to exhibit the symptoms of the Fuel Tank Defect.

25
26
27

141.   Toyota knew the Class Vehicles and their fuel systems would be defective in design, materials, manufacture, and/or workmanship, would fail prematurely, and were not suitable for their intended use.

28

1    142.   In failing to disclose the Fuel Tank Defect, Toyota has knowingly

2  and intentionally concealed material facts and breached its duty not to do so.

3    143.   Toyota was under a duty to Plaintiffs Steven Boulom and Kathleen

4  Champigny and Class Members to disclose the defective nature of the Class

5  Vehicles and their fuel systems because:

6          (a)    Toyota was in a superior position to know the true state of

7                  facts about the defect in the Class Vehicles' fuel systems;

8          (b)    The Fuel Tank Defect poses a safety risk to Plaintiffs Steven

9                  Boulom and Kathleen Champigny and the California Sub-

10                  Class; and

11          (c)    Toyota actively concealed the defective nature of the Class

12                  Vehicles and their fuel systems from Plaintiffs Steven

13                  Boulom and Kathleen Champigny and the California Sub-

14                  Class.

15    144.   The facts Toyota misstated, concealed from, or failed to disclose to

16  Plaintiffs Steven Boulom and Kathleen Champigny and California Sub-Class

17  Members are material in that a reasonable person would have considered them to

18  be important in deciding whether to purchase or lease Class Vehicles. Had they

19  known of the Fuel Tank Defect, Plaintiffs Steven Boulom and Kathleen

20  Champigny and the other California Sub-Class Members would have paid less

21  for the Class Vehicles or would not have purchased or leased them at all.

22    145.   Toyota continued to deny and conceal the defective nature of the

23  Class Vehicles and their fuel systems even after Class Members began to report

24  problems.  Toyota also continues to represent that the fuel capacity of the Class

25  Vehicles is 14.5 gallons.

26    146.   Toyota's conduct was and is likely to deceive consumers.

27    147.   Toyota's acts, conduct, and practices were unlawful, in that they

28

1    constituted:

2           (a)    Violations of California's Consumers Legal Remedies Act;

3           (b)    Violations of the Song-Beverly Consumer Warranty Act;

4           (c)    Violations of the Magnuson-Moss Warranty Act; and

5           (d)    Breach of Express Warranty under California Commercial

6                  Code section 2313.

7           148.   By its conduct, Toyota has engaged in unfair competition and

8    unlawful, unfair, and fraudulent business practices.

9           149.   Toyota's unfair or deceptive acts or practices occurred repeatedly in

10   Defendants' trade or business and were capable of deceiving a substantial

11   portion of the purchasing public.

12          150.   As a direct and proximate result of Toyota's unfair and deceptive

13   practices, Plaintiffs Steven Boulom and Kathleen Champigny and California

14   Sub-Class Members have suffered and will continue to suffer actual damages.

15          151.   Toyota has been unjustly enriched and should be required to make

16   restitution to Plaintiffs Steven Boulom and Kathleen Champigny and the

17   California Sub-Class pursuant to §§ 17203 and 17204 of the Business &

18   Professions Code.

19                          **THIRD CAUSE OF ACTION**

20                      **BREACH OF IMPLIED WARRANTIES**

21   **PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT,**

22   **CALIFORNIA CIVIL CODE §§ 1792 AND 1791.1, *ET SEQ.***

23   **(On behalf of Plaintiffs Steven Boulom and Kathleen Champigny and the**

24           **Implied Warranty Sub-Class against All Defendants)**

25          152.   Plaintiffs Steven Boulom and Kathleen Champigny incorporates by

26   reference the allegations contained in paragraphs 1 through 118, *supra*.

27          153.   Plaintiffs Steven Boulom and Kathleen Champigny bring this cause

28

1  of action against all Defendants on behalf of themselves and the Implied

2  Warranty Sub-Class.

3       154.   Toyota was at all relevant times the manufacturer, distributor,

4  warrantor, and/or seller of the Class Vehicles. Toyota knew or had reason to

5  know of the specific use for which the Class Vehicles were purchased or leased

6  because the Class Vehicles are hybrid vehicles.

7       155.   Toyota provided Plaintiffs Steven Boulom and Kathleen Champigny

8  and Implied Warranty Sub-Class Members with an implied warranty that the

9  Class Vehicles and their components and parts are merchantable, pass without

10  objection in the trade, are fit for the ordinary purposes for which they were sold,

11  are adequately labeled, and conform to the promises and affirmations on the

12  label.  However, the Class Vehicles are not merchantable because they are not fit

13  for their ordinary purpose of providing reasonably reliable and safe

14  transportation because, *inter alia*, the Class Vehicles and their fuel systems

15  suffered from an inherent defect at the time of sale and thereafter and are not fit

16  for their particular purpose of providing safe and reliable transportation. The

17  Class Vehicles would not pass without objection in the trade, are not adequately

18  labeled and do not comfort the promises and affirmations on the label because

19  the fuel capacity of the Class Vehicles is not 14.5 gallons and the range of the

20  Class Vehicles do not approach 580 miles as a result.

21       156.   Toyota impliedly warranted that the Class Vehicles were of

22  merchantable quality and fit for their intended use.  This implied warranty

23  included, among other things: (i) a warranty that the Class Vehicles and their

24  fuel systems, which were manufactured, supplied, distributed, and/or sold by

25  Toyota, would provide safe and reliable transportation; (ii) a warranty that the

26  Class Vehicles and their fuel systems would be fit for their intended use; (iii) that

27  the Class Vehicles and their fuel systems would pass without objection in the

28

CLASS ACTION COMPLAINT

trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles would conform the promises and affirmations on their labels.

157.   Toyota impliedly warranted that the Class Vehicles were fit for their particular purpose of providing the fuel efficiency and range expected of a hybrid vehicle with a 14.5-gallon fuel tank.  Toyota knew that Plaintiffs Steven Boulom and Kathleen Champigny and the Implied Warranty Sub-Class had reason to know that the Class Vehicles were required for this particular purpose. Toyota also knew that Plaintiffs Steven Boulom and Kathleen Champigny and the Implied Warranty Sub-Class relied on Toyota's skill and judgment to furnish goods suitable for this purpose.

158.   Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs Steven Boulom and Kathleen Champigny and Class Members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, did not conform to the promises and affirmation on their labels, and were not fit for their particular purpose of providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are defective, including the defective fuel systems.

159.   The alleged Fuel Tank Defect is inherent and was present in each Class Vehicle at the time of sale.

160.   Because of Toyota's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, Plaintiffs Steven Boulom and Kathleen Champigny and the Implied Warranty Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to fail before the

1  end of their design life.

2      161.   Toyota's actions, as complained of herein, breached the implied

3  warranty that the Class Vehicles were of merchantable quality and fit for such

4  use in violation of California Civil Code §§ 1792 and 1791.1.

5                      **FIFTH CAUSE OF ACTION**

6                    **BREACH OF EXPRESS WARRANTY**

7  **(By Plaintiffs Steven Boulom and Kathleen Champigny on behalf of the**

8  **Class, or alternatively, the California Sub-Class against Defendant TMS)**

9      162.   Plaintiffs Steven Boulom and Kathleen Champigny incorporate by

10  reference the allegations contained in paragraphs 1 through 118, *supra*.

11      163.   Plaintiffs Steven Boulom and Kathleen Champigny bring this cause

12  of action on behalf of himself and on behalf of the Class, or, alternatively the

13  California Sub-class, against TMS.

14      164.   TMS provided all purchasers and lessees of the Class Vehicles with

15  an express warranty described *infra*, which became a material part of the

16  bargain. Accordingly, TMS's express warranty is an express warranty under

17  California law.

18      165.   The fuel systems were manufactured and/or installed in the Class

19  Vehicles by TMS and are covered by the express warranty.

20      166.   In a section entitled "What is Covered," TMS's express warranty

21  provides in relevant part that "This warranty covers repairs and adjustments

22  needed to correct defects in materials or workmanship of any part supplied by

23  Toyota."

24      167.   According to TMS, the Basic Warranty coverage for Toyota models

25  "is for 36 months or 36,000 miles, whichever occurs first…" The Powertrain

26  warranty coverage "is for 60 months or 60,000 miles, whichever occurs first."

27  Further, there is a Hybrid System Warranty for 96 months or 100,000 miles for

28

2019 Class Vehicles and for 10 years or 150,000 miles for 2020 Class Vehicles.

168.   TMS also sold the Class Vehicles with a Federal Emission Control Warranty and a California Emission Control Warranty. In TMS's Federal Emission Control Warranty booklet, TMS states that the Class Vehicles were "designed, built and equipped to conform at the time of sale with applicable federal emissions standard" and are "free from defects in materials and workmanship that may cause the vehicle to fail to meet these standards." The warranty expressly covers the evaporative control system, including the fuel tank. Likewise, TMS's California Emission Control Warranty provides similar protections.

169.   TMS breached the express warranties by selling and leasing Class Vehicles with fuel systems that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the defective fuel system and/or its defective components. In addition, when TMS did agree to pay a portion of the costs, TMS nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective fuel system components with similarly defective fuel system components, thus failing to "repair" the Fuel Tank Defect.

170.   Plaintiffs and members of the Class have had sufficient direct dealings with either TMS or its agents (dealerships and technical support) to established privity of contract between TMS, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between TMS and its distributors and dealers, and specifically, of TMS's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty

1    agreements were designed for and intended to benefit the consumer only.

2        171.   Plaintiffs Steven Boulom and Kathleen Champigny was not required

3    to notify TMS of the breach or were not required to do so because affording

4    TMS a reasonable opportunity to cure its breach of written warranty would have

5    been futile. TMS was also on notice of the Fuel Tank Defect from its own pre-

6    production testing, from the early complaints and service requests it received

7    from Class Members, from repairs and/or replacements of fuel system

8    components, and from other internal sources.

9        172.   TMS was further provided notice of its breach of express warranties

10   by Plaintiffs Steven Boulom and Kathleen Champigny by letter dated January

11   30, 2020.  Plaintiffs Steven Boulom also provided notice of express warranties

12   when he took his Class Vehicle to a Toyota dealership, which is a Toyota-

13   authorized provided of warranty repairs.  Despite these notices, TMS failed to

14   cure the breach of express warranties within an adequate time.

15       173.   As a direct and proximate cause of TMS's breach of express

16   warranties, Plaintiffs Steven Boulom and Kathleen Champigny and the other

17   Class Members have suffered, and continue to suffer, damages, including

18   economic damages at the point of sale or lease. Additionally, Plaintiffs Steven

19   Boulom and Kathleen Champigny and the other Class Members have incurred or

20   will incur economic damages at the point of repair in the form of the cost of

21   repair.

22       174.   Plaintiffs Steven Boulom and Kathleen Champigny and the other

23   Class Members are entitled to legal and equitable relief against TMS, including

24   actual damages, consequential damages, specific performance, attorneys' fees,

25   costs of suit, and other relief as appropriate.

26

27

28

CLASS ACTION COMPLAINT

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT FOR**

**BREACH OF EXPRESS WARRANTIES,**

**15 U.S.C. § 2303 *ET SEQ*.**

**(By Plaintiffs on behalf of the Class against All Defendants)**

175.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 118, *supra*.

176.   Plaintiffs Boulom, Champigny, and Farber bring this cause of action on behalf of themselves and the Class against TMS.

177.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

178.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

179.   TMS is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

180.   TMS's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

181.   As set forth *supra* and incorporated by reference, TMS provided a 36-month, 36,000-mile Basic Warranty, a 60-month, 60,000 mile Powertrain Warranty, and a 96-month, 100,000 mile Hybrid System Warranty for 2019 Class Vehicles and a 10 year, 150,000 mile Hybrid System Warranty for 2020 Class Vehicles.

182.   TMS breached the express warranties by selling and leasing Class Vehicles with the Fuel Tank Defect, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, fuel system components that contribute to the Fuel Tank Defect. In addition, when TMS did agree to pay a portion of the costs,

Toyota nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective fuel system components with similarly defective fuel system components, thus failing to "repair" the defect.

183.   TMS's breach of the express warranties has deprived the Plaintiffs and Class members of the benefit of their bargain by failing to provide Class Vehicles with an actual fuel capacity of 14.5 gallons as advertised.

184.   Plaintiffs and members of the Class have had sufficient direct dealings with either TMS or its agents (dealerships and technical support) to established privity of contract between TMS, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required her because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between TMS and its distributors and dealers, and specifically, of TMS's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

185.   Affording TMS a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, TMS knew or was reckless in not knowing, of the lack of truth in their statements about the fuel capacity and concomitant range of the Class Vehicles, of the material omissions concerning the standard, quality or grade of the Class Vehicles and the presence of the Fuel Tank Defect and associated safety risk, but failed to repair or replace the defective fuel system and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford TMS additional reasonable opportunities to cure its

1   breach of warranties is excused and thereby is deemed satisfied.

2        186.   Plaintiffs and members of the Class would suffer economic hardship

3   if they returned their Class Vehicles, but did not receive the return of all

4   payments made by them to TMS and/or their agents.  Thus, Plaintiffs and

5   members of the Class have not re-accepted their Class Vehicles by retaining

6   them.

7        187.   Defendants was provided notice by letters dated January 22, 2020

8   and January 30, 2020, that Plaintiffs intended to pursue a claim under the

9   MMWA on behalf of a class.

10        188.   The amount in controversy of Plaintiffs' individual claims meets or

11   exceeds the sum or value of $25,000.  In addition, the amount in controversy

12   meets or exceeds the sum or value of $50,000 (exclusive of interests and costs)

13   computed on the basis of all claims to be determined in this suit.

14        189.   TMS has been afforded a reasonable opportunity to cure its breach,

15   including when Plaintiffs and Class Members brought their vehicles in for

16   diagnoses and repair of the defective fuel systems.

17        190.   As a direct and proximate cause of TMS's breach of written

18   warranties, Plaintiffs and Class Members sustained and incurred damages and

19   other losses in an amount to be determined at trial. TMS's conduct damaged

20   Plaintiffs and Class Members, who are entitled to recover actual damages,

21   consequential damages, specific performance, diminution in value, costs,

22   attorneys' fees, and/or other relief as appropriate.

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

**FOR BREACH OF IMPLIED WARRANTIES,**

**15 U.S.C. § 2303 *et seq.***

**(By Plaintiffs on behalf of the Class against All Defendants)**

191.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 118, *supra*.

192.   Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants.

193.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

194.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

195.   Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

196.   Toyota provided Plaintiffs and the Class with an implied warranty that the Class Vehicles and their components and parts are merchantable, pass without objection in the trade, are fit for the ordinary purposes for which they were sold, are adequately labeled, and conform to the promises and affirmations on the label.  However, the Class Vehicles are not merchantable because they are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their fuel systems suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.  The Class Vehicles would not pass without objection in the trade, are not adequately labeled and do not comfort the promises and affirmations on the label because the fuel capacity of the Class Vehicles is not 14.5 gallons and the range of the

1    Class Vehicle does not approach 580 miles as a result.

2        197.   Toyota impliedly warranted that the Class Vehicles were of

3    merchantable quality and fit for their intended use.  This implied warranty

4    included, among other things: (i) a warranty that the Class Vehicles and their

5    fuel systems, which were manufactured, supplied, distributed, and/or sold by

6    Toyota, would provide safe and reliable transportation; (ii) a warranty that the

7    Class Vehicles and their fuel systems would be fit for their intended use; (iii) that

8    the Class Vehicles and their fuel systems would pass without objection in the

9    trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles

10   would conform the promises and affirmations on their labels.

11       198.   Toyota impliedly warranted that the Class Vehicles were fit for their

12   particular purpose of providing the fuel efficiency and range expected of a

13   hybrid vehicle with a 14.5 gallon fuel tank.  Toyota had reason to know that the

14   Class Vehicles were required by Plaintiffs and the Class for this particular

15   purpose because the Class Vehicles are hybrids and are purchased for fuel

16   efficiency and range.  Toyota also knew that Plaintiffs and the Class relied on

17   Toyota's skill and judgment to furnish goods suitable for this purpose.

18       199.   Contrary to the applicable implied warranties, the Class Vehicles

19   and their fuel systems at the time of sale and thereafter were not fit for their

20   ordinary and intended purpose of providing Plaintiffs and Class Members with

21   reliable, durable, and safe transportation, would not pass without objection in the

22   trade, were not adequately labeled, did not conform to the promises and

23   affirmation on their labels, and were not fit for their particular purpose of

24   providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are

25   defective, including the defective fuel systems.

26       200.   Defendants' breach of implied warranties has deprived Plaintiffs

27   and Class Members of the benefit of their bargain by failing to provide Class

28

Vehicles with an actual fuel capacity of 14.5 gallons.

201.   Plaintiffs and members of the Class have had sufficient direct dealings with either Toyota or its agents (dealerships and technical support) to established privity of contract between Toyota, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required her because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Toyota and its distributors and dealers, and specifically, of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

202.   Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew or were reckless in not knowing, of the lack of truth in their statements about the fuel capacity and concomitant range of the Class Vehicles, of the material omissions concerning the standard, quality or grade of the Class Vehicles and the presence of the Fuel Tank Defect and associated safety risk, but failed to repair or replace the defective fuel system and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants additional reasonable opportunities to cure its breach of warranties is excused and thereby is deemed satisfied.

203.   Plaintiffs and members of the Class would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them to Defendants and/or their agents.  Thus, Plaintiffs and

members of the Class have not re-accepted their Class Vehicles by retaining them.

204. Defendants were provided notice by letters sent to TMS dated January 22, 2020 and January 30, 2020 that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

205. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

206. Defendants have been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Fuel Tank Defect.

207. As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

208. Because of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("PUTPCPL"),

### 73 Pa. Cons. Stat. Ann. §§ 201-1, *et seq.*

### (By Plaintiff Farber on behalf of the Pennsylvania Sub-Class against All Defendants)

209. Plaintiff Farber incorporates by reference the allegations contained

1    in paragraphs 1 through 118, *supra*.

2        210.   Plaintiff Alanna Farber brings this Count on behalf of herself and

3    members of the Pennsylvania Sub-Class.

4        211.   Plaintiff Farber and the members of the Pennsylvania Sub-Class are

5    persons within the context of the PUTPCPL, *see* 73 Pa. Cons. Stat. § 201-1, who

6    purchased and/or leased class vehicles for personal, family, or household use.

7        212.   Defendants are "persons" within the context of the PUTPCPL.  *See*

8    73 Pa. Cons. Stat. § 201(2).

9        213.   Defendants engaged in trade and commerce within the context of the

10   PUTPCPL.  *See* 73 Pa. Cons. Stat. § 201-2(3).

11       214.   Defendants violated 73 Pa. Cons. Stat. §201-2(4)(v) by representing

12   that Class Vehicles have characteristics, uses, benefits and/or qualities they do

13   not possess.

14       215.   Defendants violated 73 Pa. Cons. Stat. §201-2(4)(viii) by

15   representing that Class Vehicles are of a particular standard, quality, or grade

16   when they are of another.

17       216.   Defendants violated 73 Pa. Cons. Stat. §201-2(4)(ix) by advertising

18   goods with the intent not to sell them as advertised.

19       217.   Defendants violated 73 Pa. Cons. Stat. §201-2(4)(xxi) by engaging

20   in deception, fraud, false pretense, false promise, misrepresentation, knowing

21   concealment, suppression and/or omission of material facts concerning Class

22   Vehicles with the intent to deceive Plaintiff Farber and members of the

23   Pennsylvania Sub-Class.

24       218.   Defendants committed unconscionable, deceptive and unfair trade

25   practices, including, but not limited to, deception, fraud, false pretense, false

26   promise, misrepresentation and the knowing concealment, suppression and

27   omissions of materials facts concerning the Class Vehicles' Fuel Tank Defect

28

and corresponding safety risk with the intent that Plaintiff Farber and members of the Pennsylvania Sub-Class would rely upon their misstatements and omissions in connection with the sale and/or advertisement of Class Vehicles.

219.   Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Farber and members of the Pennsylvania Sub-Class the characteristics of the Class Vehicles' fuel systems with respect to materials, manufacture, durability, design, capacity, and longevity.

220.   Defendants that Plaintiff Farber and members of the Pennsylvania Sub-Class would, in the course of their decision to expend money in purchasing, leasing, and/or repairing Class Vehicles, reasonably rely upon the misrepresentations, misleading characterizations and material omissions concerning the quality of the Class Vehicles' fuel systems with respect to materials, workmanship, design, manufacture, and information in the owner's manuals.

221.   Information regarding the Fuel Tank Defect is material to consumers in that the defect poses a safety risk and is directly related to the fuel efficiency and range of the Class Vehicles, which is why consumers purchase hybrid vehicles.

222.   Defendants violated the PUTPCPL by failing to inform Class Vehicles owners and lessees prior to purchase and/or lease, or during the warranty period, that Class Vehicles' fuel system were defectively design and/or manufactured and were accompanied by misstatements about the fuel capacity of the fuel tank.

223.   Defendants violated the PUTPCPL by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicles' fuel systems contained defects and would require replacement of expensive components.

224.   As a proximate and direct result of Defendants' unfair and deceptive trade practices, Plaintiff Farber and members of the Pennsylvania Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.

225.   Plaintiff Farber and members of the Pennsylvania Sub-Class experienced the Fuel Tank Defect, monetary damages in the form of the premium they paid for hybrid vehicles which were held out to be efficient, operable and safe vehicles, diminution of Class Vehicle resale, and other substantial damages and inconvenience.

226.   The conduct of Defendants offends public policy as established by statutes and common law, is immoral, unethical, oppressive and/or unscrupulous and caused unavoidable and substantial injury to Class Vehicles owners and lessees, who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

227.   Plaintiff Farber and members of the Pennsylvania Sub-Class demand judgment against Defendants for restitution, disgorgement, statutory and actual monetary damages, including multiple damages, interest, costs, and attorneys' fees and injunctive relief, including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices as described herein.

**EIGHTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

**(By Plaintiff Farber on behalf of the Pennsylvania Sub-Class against All Defendants)**

228.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 118, *supra*.

229.   Plaintiff Alanna Farber brings this Count on behalf of herself and

1    members of the Pennsylvania Sub-Class.

2        230.   Toyota was at all relevant times the manufacturer, distributor,

3    warrantor, and/or seller of the Class Vehicles through their authorized agents for

4    retail sales. Toyota knew or had reason to know of the specific use for which the

5    Class Vehicles were purchased or leased because the Class Vehicles are hybrid

6    vehicles.

7        231.   Toyota provided Plaintiff Farber and Pennsylvania Sub-Class

8    Members with an implied warranty that the Class Vehicles and their components

9    and parts are merchantable, pass without objection in the trade, are fit for the

10   ordinary purposes for which they were sold, are adequately labeled, and conform

11   to the promises and affirmations on the label.  However, the Class Vehicles are

12   not merchantable because they are not fit for their ordinary purpose of providing

13   reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles

14   and their fuel systems suffered from an inherent defect at the time of sale and

15   thereafter and are not fit for their particular purpose of providing safe and

16   reliable transportation.  The Class Vehicles would not pass without objection in

17   the trade, are not adequately labeled and do not comfort the promises and

18   affirmations on the label because the fuel capacity of the Class Vehicles is not

19   14.5 gallons and the range of the Class Vehicle does not approach 580 miles as a

20   result.

21       232.   Toyota impliedly warranted that the Class Vehicles were of

22   merchantable quality and fit for their intended use.  This implied warranty

23   included, among other things: (i) a warranty that the Class Vehicles and their

24   fuel systems, which were manufactured, supplied, distributed, and/or sold by

25   Toyota, would provide safe and reliable transportation; (ii) a warranty that the

26   Class Vehicles and their fuel systems would be fit for their intended use; (iii) that

27   the Class Vehicles and their fuel systems would pass without objection in the

28

trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles would conform the promises and affirmations on their labels.

233.   Toyota impliedly warranted that the Class Vehicles were fit for their particular purpose of providing the fuel efficiency and range expected of a hybrid vehicle with a 14.5 gallon fuel tank.  Toyota knew that Plaintiff Farber and Pennsylvania Sub-Class had reason to know that the Class Vehicles were required for this particular purpose.  Toyota also knew that Plaintiff Farber and Pennsylvania Sub-Class relied on Toyota's skill and judgment to furnish goods suitable for this purpose.

234.   Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Farber and Pennsylvania Sub-Class Members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, did not conform to the promises and affirmation on their labels, and were not fit for their particular purpose of providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are defective, including the defective fuel systems.

235.   Plaintiffs and members of the Class have had sufficient direct dealings with either Toyota or its agents (dealerships and technical support) to established privity of contract between Toyota, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required her because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Toyota and its distributors and dealers, and specifically, of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

236.   The alleged Fuel Tank Defect is inherent and was present in each Class Vehicle at the time of sale.

237.   Because of Toyota's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, Plaintiff Farber and Pennsylvania Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to fail before the end of their design life.

238.   Toyota's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2315.

239.   As a direct and proximate result of Defendants' breach of the implied warranties of merchantability and fitness for particular purpose, Plaintiff Farber and members of the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

**(By Plaintiff Farber on behalf of the Pennsylvania Sub-Class against TMS)**

240.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 118, *supra*.

241.   Plaintiff Alanna Farber brings this cause of action on behalf of herself and members of the Pennsylvania Sub-Class.

242.   TMS provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, TMS's express warranty is an express warranty under Pennsylvania law.

243.   The fuel systems were manufactured and/or installed in the Class

1    Vehicles by TMS and are covered by the express warranty.

2        244.   In a section entitled "What is Covered," TMS's express warranty

3    provides in relevant part that "This warranty covers repairs and adjustments

4    needed to correct defects in materials or workmanship of any part supplied by

5    Toyota."

6        245.   According to TMS, the Basic Warranty coverage for Toyota models

7    "is for 36 months or 36,000 miles, whichever occurs first…" The Powertrain

8    warranty coverage "is for 60 months or 60,000 miles, whichever occurs first."

9    Further, there is a Hybrid System Warranty for 96 months or 100,000 miles for

10   2019 Class Vehicles and a Hybrid System Warranty for 10 years or 150,000

11   miles for 2020 Class Vehicles.

12       246.   TMS breached the express warranties by selling and leasing Class

13   Vehicles with fuel systems that were defective, requiring repair or replacement

14   within the warranty period, and refusing to honor the express warranty by

15   repairing or replacing, free of charge, the defective fuel system and/or its

16   defective components. In addition, when TMS did agree to pay a portion of the

17   costs, TMS nevertheless breached the express warranty by simply replacing

18   Plaintiffs' and Class Members' defective fuel system components with similarly

19   defective fuel system components, thus failing to "repair" the Fuel Tank Defect.

20       247.   Plaintiffs and members of the Class have had sufficient direct

21   dealings with either TMS or its agents (dealerships and technical support) to

22   established privity of contract between TMS, on one hand, and Plaintiffs and

23   each of the other Class Members on the other hand.  Nonetheless, privity is not

24   required her because Plaintiffs and each of the other Class Members are intended

25   third-party beneficiaries of contracts between TMS and its distributors and

26   dealers, and specifically, of TMS's express warranties.  The dealers were not

27   intended to be the ultimate consumers of the Class Vehicles and have no rights

28

CLASS ACTION COMPLAINT

under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

248.   Plaintiff Farber was not required to notify TMS of the breach or were not required to do so because affording TMS a reasonable opportunity to cure its breach of written warranty would have been futile. TMS was also on notice of the Fuel Tank Defect from its own pre-production testing, from the early complaints and service requests it received from Class Members, from repairs and/or replacements of fuel system components, and from other internal sources.

249.   TMS was further provided notice of its breach of express warranties by Plaintiff Farber by letter dated January 22, 2020.  Plaintiff Farber also provided notice of express warranties when she took her Class Vehicle to Sloane Toyota, a Toyota-authorized provided of warranty repairs.  Despite these notices, TMS failed to cure the breach of express warranties within an adequate time.

250.   As a direct and proximate cause of TMS's breach of express warranties, Plaintiff Farber and the Pennsylvania Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff Farber and the Pennsylvania Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

251.   Plaintiff Farber and the Pennsylvania Members seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, restitution, the repair or replacement of all class vehicles, the refund of money paid to own or lease all class, and appropriate equitable relief including injunctive relief, a declaratory judgment, and a court order enjoining TMS's wrongful acts and practices, and any other relief to which Plaintiff Farber and the Pennsylvania Sub-Class Members may be entitled.

1

**TENTH CAUSE OF ACTION**

2

**UNJUST ENRICHMENT**

3

**(By Plaintiffs on Behalf of the Class, or Alternatively on behalf of the**

4

**California and Pennsylvania Sub-Class against All Defendants)**

5

252.   Plaintiffs incorporate by reference the allegations contained in

6

paragraphs 1 through 118, *supra*.

7

253.   Plaintiffs bring this cause of action on behalf of themselves and the

8

Class, or alternatively, Plaintiffs Steven Boulom and Kathleen Champigny bring

9

this cause of action on behalf of himself and the California Sub-Class and

10

Plaintiff Farber brings this cause of action on behalf of herself and the

11

Pennsylvania Sub-Class.

12

254.   As a direct and proximate result of Toyota's misrepresentations

13

about the fuel capacity, range, and safety of the Class Vehicles and failure to

14

disclose known defects, Toyota has profited through the sale and lease of the

15

Class Vehicles.  Although these vehicles are purchased through Toyota's agents,

16

the money from the vehicle sales flows directly back to Toyota.

17

255.   As a result of its wrongful acts, concealments, and omissions of the

18

defect in its Class Vehicles, as set forth above, Toyota charged higher price for

19

their vehicles than the vehicles' true value.  Plaintiffs and members of the Class

20

paid that higher price for their vehicles to Toyota's authorized distributors and

21

dealers, which are in Toyota's control.  Toyota also reaps huge profits from the

22

sale of its vehicles through its authorized distributors and dealers, netting an

23

operating income of$1.29 billion for the fiscal year ending March 31, 2019

24

alone.

25

256.   Additionally, as a direct and proximate result of Toyota's failure to

26

disclose known defects in the Class Vehicles, Plaintiffs and Class Members have

27

vehicles that will require high-cost repairs that can and therefore have conferred

28

1 an unjust substantial benefit upon Toyota.

2    257.   Toyota has been unjustly enriched due to the known defects in the

3 Class Vehicles through the use money paid that earned interest or otherwise

4 added to Toyota's profits when said money should have remained with Plaintiffs

5 and Class Members.

6    258.   As a result of the Toyota's unjust enrichment, Plaintiffs and Class

7 Members have suffered damages.

8                          **RELIEF REQUESTED**

9    259.   Plaintiffs, on behalf of themselves and all others similarly situated,

10 request the Court to enter judgment against Defendants, as follows:

11         (a)   An order certifying the proposed Class and Sub-Classes,

12               designating Plaintiffs as named representative of the Class,

13               and designating the undersigned as Class Counsel;

14         (a)   A declaration that Defendants are financially responsible for

15               notifying all Class Members about the defective nature of the

16               of the fuel system, including the need for repairs;

17         (b)   An order enjoining Defendants from further deceptive

18               distribution, sales, and lease practices with respect to Class

19               Vehicles; compelling Defendants to issue a voluntary recall

20               for the Class Vehicles pursuant to 49 U.S.C. § 30118(a);

21               compelling Defendants to remove, repair, and/or replace the

22               Class Vehicles' defective fuel systems with suitable

23               alternative product(s) that do not contain the defects alleged

24               herein; enjoining Defendants from selling the Class Vehicles

25               with the misleading information; and/or compelling TMS to

26               reform its warranty, in a manner deemed to be appropriate by

27               the Court, to cover the injury alleged and to notify all Class

28

1       Members that such warranty has been reformed;

2   (c)   A declaration requiring Defendants to comply with the

3         various provisions of the Song-Beverly Act alleged herein and

4         to make all the required disclosures;

5   (d)   An award to Plaintiffs and the Class for compensatory,

6         exemplary, and statutory damages, including interest, in an

7         amount to be proven at trial.

8   (e)   Any and all remedies provided pursuant to the Song-Beverly

9         Act, including California Civil Code section 1794;

10  (f)   Any and all remedies provided pursuant to the Magnuson-

11        Moss Warranty Act;

12  (g)   A declaration that Defendants must disgorge, for the benefit

13        of the Class, all or part of the ill-gotten profits it received

14        from the sale or lease of its Class Vehicles or make full

15        restitution to Plaintiffs and Class Members;

16  (h)   An award of attorneys' fees and costs, as allowed by law;

17  (i)   An award of attorneys' fees and costs pursuant to California

18        Code of Civil Procedure § 1021.5;

19  (j)   An award of attorneys' fees and costs pursuant to 73 Pa. Con.

20        Stat. § 201-9.2;

21  (k)   An award of pre-judgment and post-judgment interest, as

22        provided by law;

23  (l)   Leave to amend the Complaint to conform to the evidence

24        produced at trial; and

25  (m)   Such other relief as may be appropriate under the

26        circumstances.

27

28

CLASS ACTION COMPLAINT

# DEMAND FOR JURY TRIAL

260.   Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs demand a trial by jury of all issues in this action so triable.

Dated:  January 30, 2020                    Respectfully submitted,

Capstone Law APC


                                            By: /s/ Steven R. Weinmann
                                            Steven R. Weinmann
                                            Tarek H. Zohdy
                                            Cody R. Padgett
                                            Trisha K. Monesi

                                            BERGER MONTAGUE PC
                                            Russell D. Paul (*Pro Hac Vice* to be filed*)*
                                            Amey J. Park (*Pro Hac Vice* to be filed*)*
                                            Abigail J. Gertner (*Pro Hac Vice* to be filed)
                                            1818 Market Street
                                            Suite 3600
                                            Philadelphia, PA 19103
                                            Tel:  (215) 875-3000
                                            Fax:  (215) 875-4604
                                            rpaul@bm.net

                                            Attorneys for Plaintiffs

# EXHIBIT 1

1  Steven Weinmann (SBN 190956)
   Steven.Weinmann@capstonelawyers.com
2  Tarek H. Zohdy (SBN 247775)
   Tarek.Zohdy@capstonelawyers.com
3  Cody R. Padgett (SBN 275553)
   Cody.Padgett@capstonelawyers.com
4  Trisha K. Monesi (SBN 303512)
   Trisha.Monesi@capstonelawyers.com
5  Capstone Law APC
   1875 Century Park East, Suite 1000
6  Los Angeles, California 90067
   Telephone:  (310) 556-4811
7  Facsimile:  (310) 943-0396

8  Attorneys for Plaintiffs

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11 STEVEN BOULOM, KATHLEEN          Case No.:
   CHAMPIGNY, and ALANNA
12 FARBER, individually, and on
   behalf of a class of similarly situated   **DECLARATION OF STEVEN**
13 individuals,                       **BOULOM IN SUPPORT OF VENUE**
                                      **FOR CLASS ACTION COMPLAINT**
14          Plaintiffs,               **PURSUANT TO CIVIL CODE**
                                      **SECTION 1780(d)**
15        v.

16 TOYOTA MOTOR SALES, U.S.A.,
   INC., a California corporation,
17 TOYOTA MOTOR NORTH
   AMERICA, INC., a California
18 corporation, and TOYOTA MOTOR
   CORPORATION, a Japanese
19 corporation,

20          Defendants.

21

22

23

24

25

26

27

28

DocuSign Envelope ID: A7DB8EF0-0AF0-4F3A-B75A-00CE9615DDE9

I, Steven Boulom, declare under penalty of perjury as follows:

1.     I make this declaration based upon my personal knowledge except as to those matters stated herein that are based upon information and belief, and as to those matters I believe to be true.  I am over the age of eighteen, a citizen of the State of California, and am a named Plaintiff in the litigation described in the caption page of this declaration.

2.     Pursuant to California Civil Code section 1780(d), this Declaration is submitted in support of Plaintiff's Selection of Venue for the Trial of Plaintiffs' Cause of Action alleging violation of California's Consumers Legal Remedies Act.

3.     I reside in Carson, California, which is in the County of Los Angeles.  I keep my vehicle, which is the subject of this lawsuit, at my home in Los Angeles.  I also service my vehicle in the County of Los Angeles.

4.     I am informed and believe that Defendant Toyota Motor Sales, U.S.A., Inc., is a California corporation organized and existing under the laws of the State of California and registered with the California Secretary of State to conduct business in California. On information and belief, Defendant conducts business in Los Angeles County, including marketing, distributing, and servicing vehicles through its authorized dealerships.

///
///
///
///
///

DECLARATION OF STEVEN BOULOM IN SUPPORT OF VENUE FOR CLASS ACTION COMPLAINT

5.      Based on the facts set forth herein, this Court is a proper venue for the prosecution of Plaintiffs' Cause of Action alleging violation of California's Consumer Legal Remedies Act because the vehicle that is the subject of the lawsuit is situated here, and a substantial portion of the events giving rise to my claims occurred here. Further, Defendants conduct business in the Central District of California and the County of Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this day of January 1/30/2020 2020, in Carson, California.



en Boulom

DECLARATION OF STEVEN BOULOM IN SUPPORT OF VENUE FOR CLASS ACTION COMPLAINT